PAUL KELLY, JR., Circuit Judge.
Plaintiff-Appellant, Equal Employment Opportunity Commission (“EEOC”), on behalf of Jessica Chrysler (“Employee”), appeals from the district court’s grant of summary judgment in favor of Defendant Appellee, The Picture People (“Employer”). See Order Granting Summary Judgment, EEOC v. Picture People, Inc., No. 09-ev-02315-PAB-CBS, 2011 WL 1754522 (D.Colo. May 9, 2011) (hereinafter “Order”). The district court granted summary judgment on the basis that Employee could not establish an essential element of her case, that she was qualified — with or without accommodation — to perform an essential function of her job as a “performer” in Employer’s store. Id. at *3-*5. It also concluded that Employee’s retaliation claim failed because she could not perform an essential function of the job, and that she offered no evidence that Employer’s legitimate, non-discriminatory reasons were pretextual. Id. at *7-*8. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

Background

Employee is a congenitally and profoundly deaf individual who communicates with hearing individuals by writing notes, gesturing, pointing, and miming. She can also type, text message, and use body language. According to the EEOC, “[s]he *984 also uses basic American Sign Language (“ASL”) signs that most people can understand and speaks some words.” Aplt. Br. 4. Employer maintains that Employee “cannot read lips effectively, nor can she speak except for a few words.” Aplee. Br. 8. It also claims that Employee’s written communication skills are poor and that she scored below average on vocational tests administered by EEOC’s expert — Michael Newman. ApltApp. 310a. On October 23, 2007, Employer hired Employee to work in its Littleton, Colorado store as a “performer.” Id. at 388a. Employee’s interview occurred in writing because she was not able to meaningfully participate in a group interview with four other prospective employees. Id. at 311a-14a, 458a. Performers have four areas of responsibility: customer intake, sales, portrait photography, and laboratory duties. Id. at 100a-01a. During peak (holiday) periods, the employer hires “seasonal” performers who are scheduled to work in one of the four “zones” of responsibility listed above. Aplee. Br. 7-8; ApltApp. 98a, 207a. Arnold Aguilar, Employer’s studio manager, hired Employee to work primarily in the camera room doing photography. Aplee. Br. 7-8. During non-peak periods, Employer schedules only one manager and one performer to work at a time, termed “2-2 staff coverage.” Id. at 8; ApltApp. 337a. When 2-2 staff coverage is used, “each Performer must be able to perform all four essential functions of the Performer job....” Aplee. Br. at 8; ApltApp. 337a; Order at *1.
Employee requested an ASL interpreter for her three days of orientation training. Order at *1. Employer was unable to supply an interpreter, and Employee’s start date was delayed by three weeks. Id.; Aplt. Br. 5. Eventually, Employee secured an interpreter through the Colorado Division of Vocational Rehabilitation (“DVR”), which had been assisting with her job search. Order at *1.
Employee had the opportunity to shoot photographs on 15-20 occasions with a hearing performer; she attempted to conduct a shoot by herself on a couple of occasions. ApltApp. 247a. Employee communicated with subjects by writing notes, gesturing, and miming. Id. at 240a-47a. This was often difficult as photo subjects are usually young children. In order to sell photo packages, Employee had to write notes, gesture, or “get somebody else that could do it more efficiently....” Id. at 236a.
In November 2007, Employer dispatched Master Photographer Libby Johnston to the Littleton store to improve photography quality and sales in anticipation of the holidays. Order at *2. Ms. Johnston provided a training session. The EEOC maintains that Employee requested an ASL interpreter, but none was provided. Aplt. Br. 7. At any rate, Ms. Johnston “found [Employee’s] written communications awkward, cumbersome, and impractical ....” Aplee. Br. 17; ApltApp. 164a. She telephoned the District Manager, Candi Bryan; they conferred and recommended that Employee be reassigned exclusively to the photo lab. Order at *2. Thereafter, Employee was assigned almost exclusively to the lab. Id.
After the 2007 holiday season, Employer instructed the local acting studio manager to cut the hours of or terminate seasonal performers. Id. Employee complained about her hours, and management explained in writing that all performers’ hours had been cut. ApltApp. 336a-39a. On December 29, 2007, management notified Ms. Bryan that Employee’s performance in the lab was deteriorating — Employee was coloring with pencils instead of working, refusing to take legally required rest breaks, and demanding hours with *985 threats, when all Performers’ hours were cut. Id. at 340a. With the assistance'of the human resources department, Ms. Bryan prepared a Performance Track Counseling statement to put Employee on notice of performance problems. Id. at 341a-42a. Ms. Bryan also requested a meeting with Employee on January 9, 2008, to administer a counseling statement. The EEOC characterizes the notice as reprimanding Employee for the performance deficiencies, and for becoming “angry” and “threatening] to bring a grievance ... when [she] did not get her hours increased.” Aplt. Br. 10-11; Aplt.App. 341a-42a.
After the 2007 holiday season, Employee remained on the schedule as an employee, but was not scheduled to work. Order at *2. Employer officially terminated Employee in October 2008. Aplt. Br. 15.
In September 2009, the EEOC filed this action alleging that Employer violated the Americans With Disabilities Act (“ADA”), 42 U.S.C. § 12101. Aplt.App. 7a-18a. After discovery, Employer moved for summary judgment on all claims, and the EEOC moved for partial summary judgment on four of Employer’s affirmative defenses. On May 9, 2011, the district court granted Employer’s motion to withdraw its affirmative defenses, ruled the EEOC’s motion moot, and granted Employer’s motion for summary judgment. See Order. This appeal followed.

Discussion

We review the district court’s grant of summary judgment de novo-. Fowler v. United States, 647 F.3d 1232, 1237 (10th Cir.2011). A prima facie case of disability discrimination under the ADA requires that the Employee (1) be a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability. See EEOC v. C.R. England, Inc., 644 F.3d 1028, 1037-38 (10th Cir.2011).
The 'parties agree that Employee was disabled within the meaning of the ADA. See Order at *1. Therefore, we start with the second part of the test.
I. Was Employee Qualified for the Performer Position?
Under the ADA, it is unlawful for an employer to use qualification standards, employment tests, or other selection criteria that “screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity. ...” 42 U.S.C. § 12112(b)(6); 29 C.F.R. § 1630.15(b)(1). An employer must make “reasonable accommodations” for an otherwise qualified individual unless the employer “can demonstrate that the accommodation would impose an undue hardship on the operation of the business.... ” 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.15(d).
A. Are Verbal Communication Skills an Essential Function of the Performer Position?
Employer maintains that strong verbal communication skills are an essential function of the performer position. Whether such skills are an essential function depends in part upon whether Employer “actually requires all employees in the particular position to satisfy the alleged job-related requirement.” Hennagir v. Utah Dep’t of Corr., 587 F.3d 1255, 1262 (10th Cir.2009). If so, the next inquiry is whether verbal communication skills are *986 fundamental to the performer position. Factors to consider are:
(i) The employer’s judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.
Id.) 29 C.F.R. § 1630.2(n)(3). The essential function analysis “is not intended to second guess the employer or to require [it] to lower company standards.... Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it.” Hennagir, 587 F.3d at 1262 (internal quotations omitted); cf. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1191 (10th Cir.2003) (stating that evidence of what an employer thinks is an essential job function is important, but not conclusive).
Using the criteria listed above, verbal communication skills are an essential function of the performer position. Employer explains that a performer must be able to verbally communicate with customers (many of whom are children), Aplt. App. 53a, and it lists “[s]trong verbal communication skills” and “[s]trong customer service skills” as job qualifications for the performer position. ApltApp. 98a-99a, 155a-56a. According to Employer, “substituting written notes, gestures, and pointing for fast, efficient verbal cuing in the Camera Room is simply impractical in light of (a) the short attention span of most Picture People subjects ...; (b) the interruption to the flow of the photo shoot; (c) the inability to establish rapport with the parent and child and finally, (d) the quick 20-minute duration of each Camera Room sitting[.]” Aplee. Br. 16.
Employee is unable to fully perform three of the four duties of a performer. Although she can fully perform the lab function, her ability to (a) efficiently register and recruit customers, (b) instruct young children while taking their photos, and (c) sell photo packages by addressing customer critiques and concerns, is problematic, particularly given Employer’s business model. Employer allows only 20 minutes for each Camera Room sitting — a relatively short period of time, especially when photographing young children. Aplt.App. 53a, 172a.
The only evidence of a verbally impaired employee in the performer position is not really comparable. Ms. Wendy Duke — a former employee — is also hearing impaired, but Ms. Duke is able to speak and can effectively read lips. Id. at 169a. Though the EEOC claims that a jury could find that the differences between Ms. Duke and Employee were not as significant as urged, the EEOC does not dispute that Ms. Duke could read lips and speak and that Employee does very little of either. Order at *5. Furthermore, when 2-2 staffing is employed during most of the year, Employee is unable to fully perform three of the four main duties of a performer, while Ms. Duke was able to converse with customers while selling photos, id. at 172a, and while taking pictures, id. at 173a (“Every time I go into the camera shoot I use my voice.”). Though the EEOC maintains that Employee could communicate non-verbally, nothing suggests that ges *987 tures, pantomime, and written communication are similarly effective and efficient for these tasks. When only one other staff member is present, it simply is not feasible to delegate all of these duties. Therefore, based on the factors outlined in 29 C.F.R. § 1630.2(n)(3), we must conclude that verbal communication is an essential function of the performer position.
B. Were Reasonable Accommodations Available?
If an employee is unable to perform an essential function, the next inquiry is whether the employee could perform this job with reasonable accommodations. See Davidson, 337 F.3d at 1192. Reasonable accommodations are defined as “[mjodifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position” or “[mjodifications or adjustments that enable a covered entity’s employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.” 29 C.F.R. § 1630.2(o )(l)(ii)-(iii).
The EEOC first argues that Employer was required to modify how Employee worked as a performer “to allow her to communicate with customers using nonverbal means of communication.” Aplt. Br. 32-33. It is axiomatic, however, that an employer is not required to relieve an employee of an essential job function. See Mason v. Avaya Commc’ns, Inc., 357 F.3d 1114, 1122 (10th Cir.2004) (“[A]n employee’s request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation.”); Hennagir, 587 F.3d at 1264-65. Given that verbal communication is an essential job function, requiring Employer to eliminate this function cannot be a “reasonable accommodation” required under the ADA.
Next, the EEOC argues that Employer was required to provide ASL interpreters at staff meetings and training sessions. Aplt. Br. 34-35; Aplt. Rep. Br. 21-27; 42 U.S.C. § 12111(9)(B). The EEOC relies upon cases in which a court held that an employer was required to provide an ASL interpreter for staff meetings. Those cases are readily distinguishable. In EEOC v. UPS Supply Chain Solutions, the Ninth Circuit reversed summary judgment, finding a genuine issue of fact as to whether written agendas and outlines were a sufficient accommodation at staff meetings and training sessions, or whether an ASL interpreter was required. 620 F.3d 1103, 1111-13 (9th Cir.2010). In that case, however, it was undisputed that the employee was able to “complete his job duties [in the accounts payable division] without the assistance of an ASL interpreter.” Id. at 1105-06. Similarly, in EEOC v. Federal Express Corp., the Fourth Circuit upheld a jury’s award for punitive damages when FedEx failed to provide ASL interpreters at mandatory meetings and training sessions. 513 F.3d 360, 365, 373-74 (4th Cir.2008). The employee involved in the case was a package handler whose duties included “sorting, scanning, and stacking packages and letters.... ” Id. at 365. Again, the employee “did not need or request any accommodations with respect to the routine handling of packages....” Id. Finally, in EEOC v. Wal-Mart Stores, Inc., this court upheld an award of punitive damages when the employee was refused access to ASL interpreters for meetings and training sessions and then fired when he failed to attend without an interpreter. 187 F.3d 1241, 1243-44 (10th Cir.1999). In that case, the employee worked in the receiving department where his responsi *988 bilities included “scanning and marking labels.” Id. at 1243. Again, there is nothing to indicate that the employee needed accommodation to perform the essential functions of his job.
This case is different. Employee’s position as a performer required her to communicate extensively with customers and to conduct photo sessions with dispatch. Providing Employee with an ASL interpreter at staff meetings would not ameliorate her inability to interact verbally with customers — an essential function of the performer job. This difficulty would preclude Employer from scheduling her during non-peak periods with 2-2 staffing. No reasonable accommodation has been suggested that would allow Employee to perform her job given these constraints.
II. Whether Picture People Discriminated Against Chrysler and Terminated Her in Violation of the ADA
The district court correctly granted summary judgment on the unlawful termination claim because Employee failed to present facts showing that she was qualified for the performer job. In order to establish a prima facie case of discrimination under the ADA, a showing that the employee was qualified is necessary before proceeding to the third inquiry. See Mauerhan v. Wagner Corp., 649 F.3d 1180, 1184-85 (10th Cir.2011); Order at *7.
III. Whether Picture People Retaliated Against Chrysler in Violation of the ADA
A prima facie case of retaliation under the ADA requires: “(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.” Hennagir, 587 F.3d at 1265; 42 U.S.C. § 12203. If a plaintiff establishes these factors, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. Hennagir, 587 F.3d at 1265. If the employer can do so, the burden shifts back to the plaintiff to prove pretext, id., which requires a showing that the proffered nondiscriminatory reason is “unworthy of belief,” Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1211 (10th Cir.2010).
We assume, as did the district court, that disciplining Employee and eliminating her from the work schedule were materially adverse actions. Order at *7. We further assume that the adverse actions were related to the protected activity; the January 2008 Performance Track Counseling statement indicated that Employee announced her intention to bring a grievance against Employer if her hours were not increased. ApltApp. 341a-42a. Still, Employer presented evidence supporting nondiscriminatory reasons for the adverse actions. Order at *7. Employer states that “the reduction of work hours following the holiday [p]eak occurs as a normal byproduct of [its] normal retail business cycle, and affected all Performers.” Aplee. Br. 39. It further claims that Employee’s inability to perform all four essential job functions precluded her from being scheduled after the holidays due to 2-2 staffing, id., and this is documented in handwritten notes between Employee and Ms. Doyle, the acting studio manager. Aplt. App. 337a-38a. Employer also presented evidence that Employee was counseled because she was coloring with crayons in the lab, letting other Performers handle their own lab work, and refusing to take breaks according to company policy. See Aplt-App. 341a-42a. Employee conceded the alleged infractions. Id. at 343a (“I do the drawings when I’m *989 waiting for upload [sic] to finish .... ”), 350a (“I did not color when there was something for me to do.... I am not the only one who does this.”).
Given evidence of legitimate, nondiscriminatory reasons for the adverse actions, the burden shifts to the EEOC to establish pretext. To raise a fact issue of pretext, a plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive. This court has stated, “a plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s reasons for its action, which a reasonable fact finder could rationally find unworthy of credence.” Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1104 (10th Cir.2005), overruled on other grounds as recognized in Law Co., Inc. v. Mohawk Const, and Supply Co., 577 F.3d 1164, 1170 (10th Cir.2009). The EEOC argues that other similarly situated employees engaged in the same behavior for which Employee was reprimanded, but they were never counseled. Aplt. Br. 55-56. As the district court noted, however, evidence of the infractions of other employees was never diseloséd by the EEOC. See Order at *8. Furthermore, ample evidence in the record suggests that every employee’s hours were affected after the- peak holiday period, Aplt.App. 83a, 337a, 338a, 340a, 342a, and that scheduling is different during peak and non-peak periods, the latter requiring employees to perform work in all four listed zones, id. at 206a-09a. As noted, Ms. Chrysler was not qualified to perform work in all four zones with or without reasonable accommodation. Therefore, the evidence in the record comports with Employer’s reasons for not scheduling, and ultimately terminating, Employee. See Pinkerton v. Colo. Dep. of Transp., 563 F.3d 1052, 1065-66 (10th Cir.2009) (stating that, when supervisor’s comments about problems with employee are consistent with the listed reasons for termination, the court is “in no position to state that the numerous documented failures by the [employee] were not serious enough to justify termination”); see also Jones v. Barnhart, 349 F.3d 1260, 1267 (10th Cir.2003) (a court should not “act as a super personnel department that second guesses employers’ business judgments” (internal quotations omitted)).
IV. The Dissent
The dissent contends that both this court and the district court misapply the summary judgment standard by failing to view the evidence in the light most favorable to the non-movant, and by ignoring direct evidence of retaliatory motive. These contentions are without merit.
The dissent argues that much of the evidence favoring Employer as the moving party must be disregarded because the jury is not required to believe it. In Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court explained that in deciding a Fed.R.Civ.P. 50 motion for judgment as a matter of law, a court must consider all of the evidence, just as it must consider the record as a whole when deciding a Fed.R.Civ.P. 56 motion for summary judgment. Id. at 151, 120 S.Ct. 2097. The Court then explained that a court must review the evidence in the light most favorable to the non-movant, not decide credibility issues or weigh the evidence, because the latter two are jury functions. Id. The Court then stated:
Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court should give credence to the *990 evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.
Reeves, 530 U.S. at 151, 120 S.Ct. 2097 (internal quotations omitted). The dissent contends that this passage supports disregarding much of the evidence based upon its unsupported perception that Employer’s witnesses were biased — they had predetermined ideas about the limits of the deaf. In employment discrimination cases, the employer’s agents frequently will supply the testimony, yet they cannot be deemed interested parties any more than the dissent can impute bias to them. See Traylor v. Brown, 295 F.3d 783, 790-91 (7th Cir.2002). Moreover, the principle that we disregard controverted evidence does not displace the responsibility of a court to review the record as a whole, and to consider uncontroverted evidence in favor of Employer. Id. This is the teaching of Reeves, which recognized that “an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision, or if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.” 530 U.S. at 148, 120 S.Ct. 2097. This is the ease here.
There are other important summary judgment principles over which the dissent rides roughshod: the movant is not required to disprove the non-movant’s case, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and the non-movant must come forward with significantly probative evidence that would support a verdict in its favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
First, the dissent argues that Employer’s judgment about what is an essential job function is controverted because none of the job descriptions include oral communication as a job duty, but rather use the term “verbal communication skills” as a job qualification. This is a very thin reed, understandably not grasped by the parties. Strong verbal communication skills are listed as “Job Qualifications” on descriptions for both the Seasonal Associate and Performer positions. 1 Aplt.App. 99a, 101a. Listing strong verbal communication as a requirement for a customer-service oriented job was certainly reasonable on the part of Employer. In determining whether a function is essential we simply have no license, absent evidence, to disregard a natural reading of a written job description.
The dissent’s major point is that Employee could communicate effectively. The dissent relies on the photo shoot with the Krols, and “several other shoots” that Employee allegedly participated in. But any review of the evidence in the light most favorable to Employee does not reveal a genuine issue of material fact that would require submission to a jury. When Employee was asked how many times she took photographs in the camera room, she said “15, 20, maybe less. I don’t know.” Id. at 246a-47a. When asked how many of those times she was by herself, she answered, “[a] couple.” Id. at 247a. On most of these occasions, therefore, Employee was accompanied in the camera room by a performer who could hear and communicate orally with customers. At best, except for on very limited occasions, Employer did not find Employee qualified to work in the camera room on her own.
While the dissent points to a blanket statement given by Employee’s vocational *991 rehabilitation counselor that “deaf persons can perform a job calling for strong customer service skills and oral communication skills by using gestures, notes, and so forth,” this simply does not address Employee’s abilities any more than the fact that Employer hired Employee in the first place. In fact, it is uncontroverted that Employee had minimal lip-reading capability, and scored below average on tests administered by the EEOC’s expert. 2 Aplt.App. 310a. And while it is possible that Employee could, to some extent, “communicate with customers in the Employer’s setting and ensure that they had a pleasant experience,” it is unreasonable to expect Employer to reallocate specific job duties — requiring more than one person in the camera room at a time, or not requiring her to perform sales duties — -in order to accommodate. See Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir.1995). Employee’s job required her to take photos of very young children — who are easily distracted and in need of constant direction — in an expeditious manner. Similarly, interaction with parents, both in the photo room, and while selling the photographs, was part of her job. Therefore, effective communication was key. As we have stated, “the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards.” See Mason v. Avaya Commc’ns, Inc., 357 F.3d 1114, 1119 (10th Cir.2004) (internal quotation marks omitted). A court should be hesitant in displacing the business judgment of an employer on how to run its business.
The dissent also contends that this case is controlled by Davidson v. America Online, Inc., 337 F.3d 1179, 1191 (10th Cir.2003). Davidson is patently distinguishable. The case involved a change in company policy which effectively prevented America Online from hiring new deaf employees — even for jobs that did not require oral communication skills. Id. at 1191-92. An obvious and critical difference between Davidson and this case is that neither the district court nor the court of appeals in Davidson considered an individual’s performance on the job, as we have done here. Instead, those courts found that a jury should decide whether a blanket policy preventing deaf individuals from being hired for jobs that only required them to answer emails and handle mail could be justified as a business necessity. Id. at 1182-83, 1191-92. Therefore, summary judgment in favor of America Online was improper. Id. at 1192. Since we have abundant evidence in the record about Employee’s particular job performance here, the cases are easily distinguishable.
The dissent also claims that the court overlooks direct evidence of retaliation and that any time there is direct evidence it is sufficient evidence of pretext requiring submission of a retaliation claim to the jury. We disagree. To be sure, in an indirect case, a plaintiff may survive summary judgment with a prima facie case and a showing of pretext or direct evidence of discrimination in response to an employer’s legitimate reasons for its actions. See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1397 (10th Cir.1997). But we doubt this means that summary judgment can never be granted when there is direct evidence of retaliation, no matter how weak in the context of the entire record: such a rule would insulate one class of cases from summary judgment principles.
We need not decide that issue. This circuit has a very high bar for what constitutes direct evidence of retaliation: it does not require any inference or presumption. Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1000 n. 8 (10th Cir.2011). The statement the dissent relies upon, coming *992 in the context of a two-page performance evaluation, is not direct evidence:
• Insubordination: You don’t seem to realize that people revolve around the business; the business doesn’t revolve around the people. You became angry and threatened to bring a grievance against the Picture People when you didn’t get your hours increased.
2 ApltApp. 341a. The letter requires us to infer retaliatory motive from a chain of events — that the disciplinary notice was given to Employee because she asserted her ADA rights, and not because of the several other problems noted on the performance evaluation. This differs from the termination letter in the case referenced by the dissent, Medlock v. Ortho Biotech, Inc., 164 F.3d 545 (10th Cir.1999). In that case, the letter stated that “[a]s a result of issues raised in your deposition [including Title VII race discrimination claims], effective immediately, you are suspended from all duties on behalf of the Company.” Id. at 550. That letter did not require an inference; it directly stated that the Title VII claims were the reason for the termination. That is not the case here.
Summary judgment on the retaliation claim is proper. Employee claims that she was treated differently from other employees who engaged in the same behavior, but does not allege any specific facts or incidents to back it up. Though the dissent views that as sufficient, on summary judgment more is required. See Jones v. Denver Post Corp., 203 F.3d 748, 756 (10th Cir.2000). Summary judgment based upon disparate discipline moves from generalities to specifics: who, why, when, and where. Further, while Employee claims that the fact that she was not scheduled after Christmas shows pretext, Employer has come forward with a non-discriminatory reason for its failure to staff her: she could not perform all functions of the job and, therefore, could not be staffed during 2-2 staffing.
The performance evaluation does contain numerous non-retaliatory reasons. These include: refusing to take a break, spending time on the clock to color, and demanding hours after initially refusing to shoot photo sessions in December. 2 Aplt. App. 341a. It mentions that Employer was only able to schedule Employee during busy times because of her inability to perform all required tasks. Id. Employee has failed to identify sufficient evidence to create an issue of fact as to pretext.
AFFIRMED.