**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

ALLISON LAMM,

    Plaintiff - Appellant,

v.

DEVAUGHN JAMES, LLC,

    Defendant - Appellee.

No. 19-3167
(D.C. No. 6:18-CV-01124-JTM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **McHUGH**, and **EID**, Circuit Judges.
_____

Plaintiff-appellant Allison Lamm worked for defendant-appellee DeVaughn James, LLC ("DJ"), a personal injury law firm, from September 2013 until her termination on June 23, 2016. Lamm, who began suffering from anxiety and other mental health issues as a teenager, was diagnosed with Generalized Anxiety Disorder ("GAD") and panic attacks in May 2016.

Lamm began having attendance issues even before her diagnosis: she missed at least 133.5 hours of scheduled workdays in the first six months of 2016. In late 2015 or early 2016, she asked to be permitted to work half-days "on the days that [she]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

experience[s] intense anxiety" as an accommodation under the Americans with Disabilities Act (ADA). App'x Vol. II at 440. The firm denied Lamm's request and, after additional absences, terminated her employment.

Lamm sued DJ in the District of Kansas, alleging violations of the ADA. The court granted DJ's motion for summary judgment, and Lamm now appeals. We affirm.

## I.

Lamm, along with her fellow litigation case manager Velma Thompson, was expected to work forty hours per week at DJ, except on the occasion that a client required work on certain evenings or weekends. DJ's paid time off ("PTO") policy permitted employees 120 hours, annually, of PTO. In the event that an employee exceeded this allotment, she would "be penalized and sent home for one (1) day without pay . . . [and if the employee] continue[d] to go negative[,] . . . more severe consequences [would] occur at the discretion of management up to and including termination." *Id.* at 306.

In 2015, before she was diagnosed with anxiety, Lamm was warned about her attendance, although she did not exceed the 120-hour allotment set forth by DJ. From January to June 2016, Lamm missed more hours across thirty scheduled work days than DJ's PTO policy permits in an entire year. Although Lamm had exceeded her allotted PTO, DJ granted her permission to go on a trip to San Francisco during this time. According to Lamm, in the spring of that year, she began "dealing with numerous panic attacks" and continued to miss work after returning from San

Francisco. *Id.* at 239. In mid-May, her counselor, Kristin Kroeker, diagnosed her with GAD and wrote a letter recommending that Lamm work only half-days when she experienced "intense anxiety." *Id.* at 440. Lamm provided this letter directly to DJ. This was the only information Lamm provided the firm on what would help her cope with her alleged disability.

On June 3, 2016, DJ reminded Lamm that she was expected to work forty hours per week, told her that she was falling behind on her assignments, and offered her one unpaid week off, which Lamm declined. Lamm was then absent for three days that month, for reasons unrelated to anxiety. On June 23, DJ terminated Lamm's employment.

Lamm filed a complaint in the District of Kansas on April 20, 2018, alleging that DJ had discriminated and retaliated against her in violation of the ADA. DJ moved for summary judgment after the court issued the pretrial order. The district court granted DJ's motion for summary judgment as to Lamm's two claims: (1) that the firm failed to accommodate her disability as required under the ADA and (2) that it retaliated against her for her request and prior anxiety-related absences.[1]

---

[1] In her complaint, Lamm had also argued that her termination violated public policy and the Kansas Act Against Discrimination (KAAD). But, as the district court correctly noted, in her response to DJ's motion for summary judgment, she withdrew her public policy claim and acknowledged "that her claims under Kansas law are essentially measured under the same standard applicable to her federal discrimination claims." App'x Vol. IV at 907 n.1. Thus, according to the court, "the two claims at issue are the plaintiff's failure-to-accommodate and retaliation claims." *Id.* On appeal, Lamm addresses only these same two claims, and additionally argues that the district court should have addressed her general discrimination claims.

On appeal, Lamm argues that the district court erred in granting summary judgment on the grounds that (1) she failed to meet her initial burden on her failure to accommodate claim, (2) she did not satisfy her burden to show DJ's legitimate, nondiscriminatory reason was pretext on her retaliation claim, and (3) it did not address her discrimination claims. We address each argument in turn below.

## II.

This court reviews "a district court's grant of summary judgment de novo, using the same standard applied by the district court pursuant to Fed. R. Civ. P. 56(a)." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). Summary judgment must be granted if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This court views "facts in the light most favorable to the non-moving parties, . . . resolving all factual disputes and reasonable inferences in their favor." *Cillo*, 739 F.3d at 461 (internal quotation marks omitted).

## III.

### a. Failure to accommodate

The ADA's prohibition on discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can prove that making such an accommodation would be unduly burdensome on the operation of its business. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) (quoting 42 U.S.C. § 12112(b)(5)(A)).

4

On a failure to accommodate claim, a plaintiff is not required to prove the employer's motivation or intent to discriminate "[b]ecause 'any failure to provide reasonable accommodations for a disability is necessarily because of disability.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (quoting *Punt*, 862 F.3d at 1048).  Rather, this type of claim is evaluated under a burden-shifting framework: a plaintiff must make an initial showing that "(1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation."  *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012).  We collapse our analysis of the second and third prongs.[2]

As an initial matter, we agree with the district court's view that it is "not necessary to resolve the issue" whether Lamm should be considered disabled given that it is possible to resolve this case on other grounds, namely the remaining prongs needed to establish both failure to accommodate and disparate treatment claims.  App'x Vol. IV at 907 n.1.

---

[2] We note that the third prong of this analysis (whether Lamm requested a reasonable accommodation) is subsumed by the second (whether Lamm is a qualified individual) in this order.  In cases where the plaintiff has requested an indefinite accommodation, our case law recognizes that the two analyses are essentially identical.  *See, e.g.*, *Punt*, 862 F.3d at 1051 (determining that the plaintiff did not make a reasonable request, but relying on qualified-individual case law).  Qualified-individual analysis requires asking whether any reasonable accommodation would enable Lamm to perform the essential functions of her job.  This question naturally lends itself to the broader inquiry of what a reasonable accommodation is (and is not).  Therefore, we incorporate analysis of whether the accommodation Lamm requested is reasonable into our assessment of the qualified-individual prong.

A qualified individual for purposes of the ADA is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This court applies a two-part analysis to determine whether an employee is a qualified individual: first, we determine whether she can perform the "essential functions of the job," *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003), and, if not, whether any "reasonable accommodation by the employer would enable [her] to perform those functions," *Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012) (unpublished).[3]

An essential function of a job "is defined as 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 915 (10th Cir. 2004) (quoting 29 C.F.R. § 1630.2(n)(1)). We look to (1) the employer's judgment; (2) written job descriptions; (3) what results if the employee does not perform the function; and (4) current work experience of other employees in comparable positions. *See EEOC v. Picture People, Inc.*, 684 F.3d 981, 986 (10th Cir. 2012). Lamm cites *Mason v. Avaya Communications, Inc.* to support her claim that "DJ was required to provide undisputed evidence that a job requirement is an essential job function." Aplt. Br. at

---

[3] Although not precedential, we find the discussion in *Valdez* and all other unpublished opinions we rely on herein to be instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

18 (citing 357 F.3d 1114, 1120 (10th Cir. 2004)).  But that case contains no such holding.

On the contrary, the essential function inquiry is "not intended to second guess the employer."  *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001).  Rather, the ADA requires us to consider "the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  Generally, this court does not "second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity."  *Mason*, 357 F.3d at 1119 (citing *Davidson*, 337 F.3d at 1191).

> According to DJ, Lamm's essential functions were as follows:
>
> (1) regular and predictable attendance for 40 hours per week during normal business hours in the office; (2) placing and receiving calls to/from witnesses, opposing counsel, and the courts; . . . (3) personally interacting with DeVaughn James attorneys, paralegals, and legal assistants; and (4) meeting with clients in the office to prepare discovery responses.

Aple. Br. at 29.   DJ's description satisfies the standard set forth by *Mason*, and we find that Lamm was unable to fulfill her position's essential functions.  Viewing the record in the light most favorable to Lamm, it is uncontroverted that she missed at least 133.5 hours of work in the first half of 2016 alone, which is substantially more than the 120 total hours of PTO per year permitted by the firm.  She does not dispute that twice in one week she informed DJ of her absence on the same day that it occurred, contrary to DJ's policy of requiring five days' notice and approval for absences.  Lamm also does not dispute that her anxiety sometimes kept her "away

from work" and that she was unable to tell DJ "how often or how long" she would need to take off from work because of it. App'x Vol. II at 264. Lamm was absent from her duties excessively and often without warning; thus, she could not fulfill the essential functions of "regular and predictable attendance" and completing administrative and client-facing tasks.

Lamm contends that her physical presence in the office was not an essential function of her work. But Lamm's focus on physical presence in the office is a red herring because she did not ask to work remotely, but to simply *not work* for half the day when she was feeling overwhelmed by her anxiety on a unilateral as-needed basis and with no advance notice to her employer.

At summary judgment, Lamm claimed that she had initially made two requests in addition to taking half-days off when she experienced anxiety attacks: to work from home and to receive additional time off from work while her medications took effect. But, as the district court correctly noted, Lamm's account of these requests is belied by the absence of any such recommendation in her counselor's letter supporting her accommodation request (the only such document Lamm offered on this point). Kroeker wrote that her "profession[al] recommendation [is] to be able to work half days on the days with intense anxiety." *Id.* at 440. Lamm's suggestion that she made additional requests—a suggestion that appears several times throughout the present appeal—amounts to an entirely unfounded interpretation of the letter, which contains no mention of them. We need not consider this novel and unsupported argument.

8

Next, we ask whether any reasonable accommodation would enable Lamm to perform the essential functions of her job.  We find that no reasonable accommodation would accomplish this.  This circuit has held that the term "reasonable accommodation" refers to "those accommodations which presently, or in the near future, enable the employee to perform the essential functions of [her] job." *Lincoln*, 900 F.3d at 1205.  According to this court's case law, "[w]hether an accommodation is reasonable under the ADA is a mixed question of law and fact . . . [but] an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason*, 357 F.3d at 1122.  The determination of whether a requested accommodation is reasonable must be "made on the facts of each case taking into consideration the particular individual's disability and employment position." *Punt*, 862 F.3d at 1050.

The accommodation Lamm requested of DJ was unreasonable as a matter of law under *Mason*.  The district court properly identified Lamm's accommodation request as the indefinite flexibility to work half-days when she was experiencing anxiety.  The accommodation Lamm proposed—not working for half-days—would do nothing to enable her to fulfill the essential functions of her job.  Therefore, we conclude that the accommodation Lamm requested is unreasonable.  Because Lamm cannot perform the essential functions of her job, and no reasonable accommodation would enable her to do so, she is not a qualified individual.

Lamm argues that the burden to "identify all potential reasonable accommodations" did not rest squarely on her, but that during the "interactive

9

process", as specified in the Code of Federal Regulations, DJ is required to look for options. Aplt. Br. at 24. This would be true if she was an "otherwise qualified" employee. Because Lamm is not "otherwise qualified," as we explain in greater detail below, the interactive process is not mandatory in her case.

According to the Code of Federal Regulations' section on implementing the ADA, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). This circuit has used even stronger language, holding that there is an "*obligation* . . . [to] engag[e] . . . in good faith in an interactive process" with a qualified individual. *Aubrey v. Koppes*, 975 F.3d 995, 1009 (10th Cir. 2020) (emphasis added). This process is meant to start a dialogue between an employer and employee about the extent of the latter's limitations and the former's possibilities for accommodation. *See Valdez*, 462 F. App'x at 819.

Lamm seems to suggest that the lack of an interactive process itself gives rise to liability under the ADA. But the interactive process is "only a means to an end." *Id.* Failure to engage in it is not a basis for liability; rather, it makes up a part of a failure to accommodate claim. *See Lowe v. Indep. Sch. Dist. No. 1 of Logan Cty.*, 363 F. App'x 548, 552 (10th Cir. 2010) (unpublished). Moreover, an employer need not engage in a "futile interactive process where . . . no reasonable accommodation was possible" (that is, when the employee is not a qualified individual). *Valdez*, 462 F. App'x at 819. Because, as shown above, Lamm is not a qualified individual, DJ

10

was not required to engage in the interactive process with her. Therefore, we need not assess whether DJ conducted such a process in good faith.

### b. Retaliation

The ADA prohibits "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter" and "interfer[ing] with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(a)–(b). Unlike the prosecution of an ADA discrimination claim, which requires a plaintiff to show that she is a "qualified individual with a disability," *Davidson*, 337 F.3d at 1188 (internal quotation marks omitted), to prosecute an ADA retaliation claim, a plaintiff only needs to show that she had a reasonable and good-faith belief that she was disabled, *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016); *see also* 42 U.S.C. § 12203(a) (stating that the ADA retaliation provision protects "'*any individual*' who has opposed any act or practice made unlawful by the ADA") (emphasis added).

Unless the plaintiff offers direct evidence of retaliation, which "requires proof of . . . oral or written statements on the part of a defendant showing a discriminatory motivation," *Cuenca v. Univ. of Kan.*, 101 F. App'x 782, 788 (10th Cir. 2004) (unpublished), we analyze retaliation claims under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

First, to establish a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in a protected activity; (2) she was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the adverse employment action." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). Then, assuming the plaintiff satisfies this burden, the burden shifts to the employer to demonstrate that it had a "legitimate, nondiscriminatory reason for the adverse action." *Picture People*, 684 F.3d at 988. If the employer can make such a showing, the burden of production "shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *Id.*

Lamm contends that the *McDonnell Douglas* framework is inapplicable in this case because she has provided direct evidence of retaliation, namely DJ's statement that in deciding whether to terminate Lamm, it used her entire attendance history, including "anxiety absences," which DJ later modified to merely "absences." App'x Vol. II at 457. She also advances DJ's statements that Lamm "was allowed to take days off without prior notice and approval with no repercussions," that she "would not have been terminated" if she hadn't missed work on certain dates in June 2016, and that she was "terminated . . . for the totality of her absences, including her absences related to her mental impairment" as examples of direct evidence. Aplt. Br. at 17 (emphasis omitted).

12

This circuit has a "very high bar" for what comprises direct evidence of retaliation. *Picture People*, 684 F.3d at 991. To constitute direct evidence, a statement must not require any inference or presumption. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011). Rather, the statement "must itself show that the decisionmaker acted because of the prohibited animus." *Id.* at 1003 (quoting *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010)). Lamm's evidence plainly falls short.

First, Lamm contradicts her own argument about the directness of the evidence she offers by suggesting that a finder of fact, assessing DJ's statements, "could draw the inference that an illegitimate criterion—Lamm's disability—motivated her firing." Aplt. Br. at 17 (emphasis omitted). Evidence requiring an inferential deduction does not amount to direct evidence. Lamm's conclusion seems to concede that she has offered only indirect evidence.

Second, none of these statements clearly reflects illegal animus. It is entirely plausible that DJ's reasoning had nothing to do with anxiety at all, but rather the absences that came with it. *See Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007) (citing *Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) (holding that "[a] statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence")).

Furthermore, Lamm imprecisely construes DJ's comments about her termination. DJ notes on the employer notice portion of Lamm's unemployment

13

insurance claim that one of the reasons for which the firm discharged her was "unexcused absences." App'x Vol. II at 457. In response to the form's question about whether any warnings were given, DJ wrote "warning for anxiety absences." *Id.* This makes the inference Lamm seeks to draw even more tenuous.

In further support of a plausibly benign read of DJ's comments, the firm terminated her employment after a series of absences for which it is, according to Lamm, uncontroverted that anxiety was not the cause.

Finally, a survey of the rare published cases in which this court has held that a plaintiff offered evidence constituting direct evidence supports the view that the evidence Lamm offers does not qualify as "direct." *See, e.g.*, *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999) (holding that the plaintiff's offer of two letters from his employer informing him that it was taking adverse actions against him "[a]s a result of issues raised in [his] deposition" and because he "communicated [his] deep dissatisfaction with [his] compensation" constituted direct evidence); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) (holding that the plaintiff presented direct evidence of retaliatory motive by offering witness testimony that "several people involved in the promotion decision process had stated that [he] would not be considered for promotion because of his discrimination complaint"); *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 n.5 (10th Cir. 1992) (holding that testimony that a supervisor held the plaintiff's EEOC filing against her amounts to direct evidence of retaliation).

Now that we have determined that Lamm has presented no direct evidence of retaliation under the ADA, we go on to assess Lamm's retaliation claim under the *McDonnell Douglas* framework. We find that DJ has met its "exceedingly light" burden to articulate a legitimate and nondiscriminatory reason for terminating Lamm. *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1149 (10th Cir. 2011).

The district court correctly found that DJ's burden, which is "one of production, not persuasion[,] . . . [and thus] can involve no credibility assessment," has been satisfied. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). Additionally, we agree with the district court that Lamm has failed to show that DJ's reasoning is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

DJ explains that, following a series of excessive and often unscheduled absences, it reached a "breaking point" when Lamm continued to miss work in violation of the firm's PTO policy even after receiving a warning about how her absences would affect her job and a suggestion to take planned time off. App'x Vol. I at 141. We find this explanation satisfactory under *McDonnell Douglas*. DJ's personnel policy states that "[e]ach full time employee is to work 40 hours on a schedule set by . . . [DJ, and gets] 120 hours per calendar year of paid time off." App'x Vol. II at 306. Additionally, DJ said that it found it "much easier to handle a scheduled absence than an unscheduled absence." App'x Vol. I at 161. Indeed, this is supported by DJ's policies that "[s]cheduled PTO must be approved . . . five (5)

15

business days in advance" and that "[i]n order to call in sick, an employee must call and speak (texting alone is not acceptable)" with the office manager. App'x Vol. II at 306 (emphasis in original).

Lamm disputes neither that her absences during the first half of 2016 exceeded her annual allotment of PTO nor that their length and frequency were often unpredictable. After her June 3, 2016, meeting with DJ, during which she was told she needed to avoid further absences and was offered one week off of work, Lamm missed three more days of work despite the fact that no more PTO was available to her. That DJ considered these absences the "breaking point" squares with its written personnel policies. Thus, the firm's explanation for its decision to terminate Lamm's employment is satisfactory under *McDonnell Douglas*.

Having found that DJ satisfied its burden, we go on to determine whether Lamm has proven DJ's reasoning to be rendered unworthy of belief by a rational factfinder. First, Lamm argues that DJ's explanation for terminating her employment is pretextual because she "capably performed her job for several years." App'x Vol. III at 619. Indeed, Lamm received consistently positive evaluations during a significant portion of her time at DJ. But by the spring of 2016, Lamm's performance seems to have deteriorated, both because of her absences and quality of work. For example, Kroeker, in her letter, made recommendations to accommodate Lamm in order to "try to minimize the anxiety attacks impacting . . . [her] work." App'x Vol. II at 440.

16

Next, Lamm claims that DJ's reasons for terminating her are inconsistent. As evidence, Lamm offers DJ's responses to Lamm's June 2016 Separation Statement to the Kansas Department of Labor (KDOL). DJ initially responded that it had considered anxiety-related absences in its decision to terminate Lamm. In a second response to KDOL, however, DJ removed the reference to anxiety, noting only that it had warned Lamm about her absences in general. It is not clear how this second response—which is "more accurate than the first" because several of Lamm's unscheduled absences were unrelated to anxiety—undermines DJ's reasoning for terminating Lamm. App'x Vol. IV at 939. One response offers a broader depiction of DJ's decision-making process than the other, but neither contradicts DJ's initial reasoning such that it could be deemed unworthy of belief.

Lamm also points to the fact that Thompson, another litigation case manager, was permitted to work remotely as evidence of DJ's inconsistent reasoning. But, because Lamm offers no evidence that Thompson violated DJ's PTO policy, this is not a relevant comparison. That Thompson worked from home during a period of office overcrowding in no way undermines DJ's explanation that Lamm was terminated because of her excessive, unscheduled absences.

Finally, Lamm contends that DJ co-owner Richard James' "long and rambling responses" to questions in his deposition show pretext. The district court found that Lamm's "conclusory assertion gives no illustration of any answer, rambling or otherwise, which would render . . . [DJ's] position unworthy of belief." *Id.* We

17

agree. The mere form of James' answers in general, without more, does not amount to pretext.

In sum, we find that Lamm has not established a genuine dispute of fact about whether DJ's reasons for terminating her were pretext. Thus, summary judgment on her retaliation claim is appropriate.

### c. Discrimination

To establish a prima facie disparate treatment claim under the ADA, Lamm must prove that at the time she was terminated, (1) she was disabled; (2) she was qualified to perform the essential functions of her job, either with or without reasonable accommodations; and (3) she was fired because of her disability. *See Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015).

On appeal, Lamm argues that the district court erred by entering summary judgment without "expressly dismiss[ing] [her] disability discrimination disparate treatment claims." Aplt. Br. at 33. But a close look at the record indicates that there is not much of a claim to be dismissed. In both Counts II and III of her complaint, Lamm alleges that DJ subjected her to "disparate treatment." App'x Vol. I at 17, 19. She does not, however, offer any evidence befitting of the framework set forth above. Rather, to the extent she describes "disparate treatment," the actions about which she complains seem to fall under the category of either failure to accommodate, which she couches as a general discrimination claim, or retaliation. Aside from the brief mention of disparate treatment, which occurs in the context of her general discrimination and retaliation claims, there is no indication that Lamm meant it to be

18

an independent claim—nor did she provide any evidence to support one.  Therefore, we hold that the district court did not err in disposing of DJ's motion for summary judgment without specifically addressing the issue of treatment.

Further, Lamm's disparate treatment claim—to the rather vague extent one existed—would fail for the same reason her failure to accommodate claim does: because Lamm is not a qualified individual.

## IV.

For the reasons stated above, we accordingly AFFIRM the district court's grant of DJ's motion for summary judgment.

Entered for the Court

Allison H. Eid
Circuit Judge

19