**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

EUGENE FOSTER,

     Plaintiff - Appellant,

and

ROBERT FISK,

     Plaintiff,

v.

MOUNTAIN COAL COMPANY, LLC;
ARCH WESTERN RESOURCES, LLC;
ARCH COAL, INC.,

     Defendants - Appellees.

No. 15-1025

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-03341-LTB-MJW)**
_____

Damon J. Davis (J. Keith Killian, with him on the briefs) Killian Davis Richter & Mayle, P.C., Grand Junction, Colorado, for Plaintiff-Appellant.

Jeffrey T. Johnson (Bradford J. Williams, and Stephen G. Masciocchi, with him on the brief) Holland & Hart, LLP, Denver, Colorado, for Defendants-Appellees.
_____

Before **LUCERO**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Eugene Foster appeals from a district-court order granting summary judgment in favor of Mountain Coal Company, LLC (Mountain Coal) on his retaliation claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(a). Specifically, Foster appeals the district court's dispositive conclusion that his requests for accommodation were inadequate and untimely. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand to the district court for further proceedings.[1]

## FACTUAL BACKGROUND

In November 2004, Foster began working at Mountain Coal's West Elk Mine (West Elk) in Colorado. On February 5, 2008, while working as a long-wall maintenance supervisor, Foster turned his head quickly and felt a pop in his neck. Because his neck was still hurting the next day, Foster sought care at the Delta County Memorial Hospital emergency room. After receiving treatment, Foster had the emergency-room doctor complete a return-to-work form that detailed Foster's injury, excused Foster from work on February 6 and 7, and authorized Foster to return to work on February 8. Although he ordinarily would have returned to work on February 8, Foster had a regularly scheduled week off beginning that day and

---

[1] On January 11, 2016, Arch Coal, Inc., which through multiple subsidiaries owns all of Mountain Coal and Arch Western Resources, LLC, filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Missouri. In response, under 11 U.S.C. § 362, we abated the appeal until the automatic bankruptcy stay had been lifted. On July 5, 2016, the Bankruptcy Court lifted the stay under § 362(d) for the limited purpose of allowing us to issue the opinion in this appeal. On July 7, 2016, we lifted the abatement and now issue this opinion.

continuing until February 15. And Foster had already scheduled a hernia operation for February 15 that required a recovery period extending until March 28. In all, Foster missed work from February 6 to March 28.

## A. Mountain Coal Rejects Original Return-to-Work Form

On February 10, Ed Langrand, the Manager of Human Resources at Mountain Coal, called Foster to a meeting with West Elk management to discuss the neck injury. Foster testified that sometime during the meeting, a West Elk work-safety manager "jumped out of his chair and stated he had talked to so-and-so in St. Louis, and this was not going to be a workmen's comp accident." Appellant's App. vol. 2 at 412. Although Foster was surprised by the safety manager's outburst, the meeting continued. Langrand, along with other senior managers at West Elk, recommended that Foster see Dr. Thomas Dwyer, an orthopedic specialist, about his neck. During the meeting, Foster provided Langrand the return-to-work form that the emergency-room doctor had completed. But Langrand rejected the form, directing Foster to have a doctor complete a Mountain Coal return-to-work form as company policy required. Foster agreed that he would do so when he went to the hospital for his hernia operation on February 15.

## B. The Disputed Return-to-Work Form

During his deposition, Foster testified about his efforts to get a doctor to complete the Mountain Coal return-to-work form for his neck injury during his hospital stay from February 15 to February 17. Specifically, Foster asked his fiancée to get the form filled out by the emergency-room doctor who had seen him on

3

February 6. This effort failed when the emergency-room doctor declined to complete Mountain Coal's forms.

Faced with this, Foster told Langrand that the emergency-room doctor had refused to complete Mountain Coal's form. In response, Langrand told Foster to have Dr. Dory Funk—Foster's primary-care doctor—complete Mountain Coal's form. Foster attempted to do so. But when Foster arrived at Dr. Funk's office, he learned that Dr. Funk was on vacation. Facing that impediment, he left the blank Mountain Coal form with an office receptionist, who told Foster she would "see about getting it filled out when Dr. Funk returned" and would call Foster to report any developments. Appellant's App. vol. 5 at 959.

About a week later, someone from Dr. Funk's office called Foster to tell him he could pick up the completed form. According to Foster, he then retrieved the form and took it straight to the West Elk office. Nobody was at the West Elk office except a receptionist whom Foster did not know. After waiting for an hour and a half, Foster got an envelope from his truck, put the completed form in the envelope, and left it on the desk of a human-resources clerk, Sandra White. Foster further testified that, while speaking by telephone with a Mountain Coal employee regarding his disability benefits on March 13, he also spoke with White, who told him she had not received the form and needed him to provide another one. Apparently, five days after talking to White, Foster again went to Dr. Funk's office, obtained another form that Dr. Funk dated and signed on March 18, and soon afterward dropped off the form at West Elk.

4

At this point in Foster's deposition, the attorneys representing Foster and Mountain Coal both agreed to discontinue Foster's deposition because he had become incoherent after ingesting his pain medication. When Foster's deposition resumed two months later, Foster testified differently about what occurred after he allegedly placed the Mountain Coal form on White's desk.

This second time, Foster testified that Langrand had told him to obtain the completed form on March 17—not that White told him to obtain the completed form on March 13. Under this account, Foster testified that he understood that White had not received the completed form Foster left on her desk, but apparently White never told him to obtain a new one. Instead, on March 17, Langrand told Foster to return a completed form to Mountain Coal. Foster testified that he went to Dr. Funk's office the day after speaking with Langrand; obtained a second completed form, dated March 18; and took it to West Elk. Mountain Coal acknowledges that it received this completed return-to-work form.

## C.    Foster Visits with Dr. Dwyer

On March 10, at Mountain Coal's direction, Foster met with Dr. Dwyer about his neck pain. After Foster's initial examination, Dr. Dwyer set out to learn more about Foster's condition by reviewing one of Foster's previous MRIs, by ordering another MRI, and by obtaining the treatment notes of Dr. Karen Nelson, who had given Foster injections to help alleviate pain. On March 24, Foster returned to Dr. Dwyer's office for a second scheduled office visit. By then, Dr. Dwyer had received the earlier MRI records and the results from the additional MRI, but still had not

5

received Dr. Nelson's injection notes. After reviewing the MRIs, Dr. Dwyer wrote in his notes that he doubted that he would "ever recommend surgery to address all of the degenerative changes in [Foster's] spine," but that with more information "a more limited surgical intervention could potentially be appropriate" after "significant consideration and discuss[ions with Foster] about expectations." Appellant's App. vol. 8 at 1631–32. Before proceeding further, Dr. Dwyer still wanted to obtain Dr. Nelson's notes and to visit more with Foster about treatment options. Foster's next appointment with Dr. Dwyer was set for April 4.

## D.    April 3 Meeting

On March 31, Foster returned to work after his hernia-operation doctor provided him a Mountain Coal return-to-work form on March 25. The form excused Foster from work from February 15 until March 28.[2] On April 3, Jim Miller, General Manager at West Elk, called Foster into a meeting with himself and Jon Wilson, a human-resources employee. Foster testified that the April 3 meeting proceeded as follows:

> Q:    What was said at the meeting, and by whom?
>
> A:    Jim Miller said, "I called Dr. Funk and he says he has not seen you over this neck thing," however he said it. And something about, "You have not been to see Dr. Funk. We called and talked to him. So you're on suspension until we can figure it out."

---

[2] This return-to-work form covered the dates Foster missed work for his hernia operation and recovery. The neck injury had its own return-to-work form, dated March 18, which Foster provided to Mountain Coal before returning to work on March 31.

Q:    What did you say?

A:    I said, "I told you over and over that I haven't seen Dr. Funk, but you all keep asking for a back-to-work slip from Dr. Funk. Dr. Funk hasn't seen me."

Q:    And what did Mr. Miller, or anyone else, say?

A:    Jim just shook his head. Kevin Jensen [West Elk's maintenance superintendent] did walk in at that point.

Q:    Okay.

A:    Because Jim said, "Well, Dr. Funk said he hasn't seen you." And I said, "Well, that's what I keep telling you, I haven't seen Dr. Funk." And I said, "You sons-a-bitches has been trying to get rid of me for the last year, one way or another." And I said, "You all are using any excuse you all can to get me out of here." And I asked Kevin again, I said, "I've got retraining this week. And I've got surgery scheduled—going to see the doctor [Dr. Dwyer] and schedule surgery for Friday—on Friday. I need to get these took care." He says, "You're on suspension. Don't do nothing."

Q:    All right. Let me see if I understand what you said. You said you had retraining scheduled for next week; is that right?

A:    The next day.

Q:    For the next day?

A:    Yes.

Q:    And then you said you had surgery scheduled for—

A:    I had an appointment with the doctor to schedule surgery.

Q:    And you were referring to Dr. Dwyer?

A:    Yes.

7

Q:      For the next day?

A:      Yes. All I asked was a little cooperation. No, they—
        nothing.

Appellant's App. vol. 2 at 420–21.

We now turn to Mountain Coal's account of the April 3 meeting.[3] Mountain Coal acknowledges that two weeks before the meeting Foster had provided it with Dr. Funk's completed return-to-work form, dated March 18. Even so, Mountain Coal remained unsatisfied. Jensen testified that during the meeting Miller told Foster that Mountain Coal had called Dr. Funk's office about the first return-to-work form Foster claimed to have earlier placed on White's desk. Miller told Foster that Dr. Funk's office didn't have a copy of any such form. Jensen testified that he remembered Miller telling Foster that Foster's actions related to the earlier return-to-work form had put the mine in a "precarious situation." Appellant's App. vol. 3 at 560. Neither Jensen nor Miller explained what Miller meant by this. According to Jensen, Miller, and the memorandum, Foster then told the managers, "I'm not lying to you. You know I'm not lying to you." *Id.* at 561. Miller responded, "The facts tell us otherwise." *Id.* The managers suspended Foster indefinitely, pending an investigation into whether Foster had indeed lied about providing an earlier-completed form. Miller testified that Foster said, "You can fire me tomorrow but it

_____

[3] The testimony of the Mountain Coal managers—Miller, Wilson, and Jensen—was consistent with an undated and unsigned memorandum that Miller believes Wilson wrote shortly after the April 3 meeting. Kevin Jensen, who was also present at the meeting, testified that the memorandum accurately recounted what happened.

8

won't be for lying," and noted that Foster "probably" told the managers that Mountain Coal was "just trying to get rid of me because I'm a liability."[4] Appellant's App. vol. 6 at 1367.

Here it is worth pausing to note the dramatic difference between the parties' accounts of what happened at the April 3 meeting. Foster contends that Mountain Coal suspended him because he had obtained the March 18 return-to-work form from Dr. Funk, who had never personally examined Foster for his neck injury. Mountain Coal maintains it suspended Foster because it believed that he had lied about obtaining and delivering the earlier return-to-work form—the one Foster testified that he placed on White's desk.

Later on April 3, Miller, Wilson, and Jensen called Dr. Funk's office to ask again about the missing form Foster said that he had placed on White's desk. During

---

[4] While working for Mountain Coal, Foster had medical issues that had kept him from work even before his neck and hernia problems. On June 6, 2006, for example, Foster underwent surgery for a "right carpal tunnel release" and "ulnar neurolysis, right elbow, with anterior transposition of ulnar nerve" to treat his diagnosed "right carpal tunnel syndrome" and "right cubital tunnel syndrome." Appellant's App. vol. 7 at 1574. Foster was able to return to work on July 5, 2006, with restrictions on his work activities. On July 18, 2006, Foster underwent surgery for a "left carpal tunnel release" and "neurolysis of the ulnar nerve, left elbow with anterior transposition" to treat his diagnosed "left carpal tunnel syndrome" and "left cubital tunnel syndrome." Appellant's App. vol. 1 at 163. The record contains a work-release form that allowed Foster to return to work on December 6, 2006, with certain restrictions, although it is unclear whether he was able to return to work before December 6. These restrictions resulted from Foster's carpal-tunnel surgery (it is unclear which surgery, although the hard-to-read form seems to say "bilateral carpel tunnel release," referring to both surgeries) and restricted Foster from (1) lifting objects over 20 pounds, (2) wearing a hard-hat, and (3) wearing a tool belt. *Id.* at 169. It appears Mountain Coal accommodated Foster's surgeries by moving him from his position as a long-wall maintenance supervisor to the position of maintenance planner, which was less physically demanding.

the call, Dr. Funk's office manager told them that Foster must have picked up the completed form on March 18 because Dr. Funk's office had not received the hospital records from Foster's emergency-room visit until March 17. Along this same line, Dr. Funk testified that he would have preferred to have the hospital records before filling out the form.

## E. Dr. Dwyer Does Not Recommend Surgery

On April 4, Foster attended his scheduled follow-up appointment with Dr. Dwyer. Foster reported that his neck condition had worsened after he had returned to work for three days and that "he was unable to work anymore due to significant increase in his pain." Appellant's App. vol. 8 at 1637. Despite Foster's worsened condition, Dr. Dwyer was uncertain that surgery was the proper treatment if Foster continued working the same job. Specifically, having now obtained Dr. Nelson's notes, Dr. Dwyer summarized his assessment of Foster's condition in his contemporaneous treatment notes: "At this point I am not certain that any surgery is really warranted." *Id.* at 1642. Dr. Dwyer "doubt[ed] that [he] would recommend carrying out" even a relatively minor surgical procedure "and then have [Foster] go back to work activities which, obviously, significantly aggravate all of his symptoms." *Id.* at 1644. Dr. Dwyer also wrote in his notes that he thought "it would probably be in [Foster's] best interest to consider different work activities." *Id.* at 1645. Dr. Dwyer remembered discussing these conclusions and recommendations with Foster during the April 4 appointment. At the end of the appointment, Foster

10

said he would consider his treatment options and would see Dr. Dwyer on an as-needed basis.

## F.     Dr. Funk Believes That Foster Is Disabled

On April 9, Foster visited Dr. Funk "to try and straighten out what is going on with his neck and concerns over potential disability." Appellant's App. vol. 6 at 1194. Dr. Funk concluded that Foster "should be considered disabled from his usual occupation at the mine secondary to his cervical [degenerative joint disease]." *Id.* at 1196. Dr. Funk did not specifically recommend surgery, since that option exceeded his area of expertise. Although Foster cannot remember many specific details of his April 9 visit with Dr. Funk, he does recall that Dr. Funk would not write a letter detailing Foster's injuries and disabled status until Dr. Funk received Dr. Dwyer's notes from Foster's April 4 appointment. Eventually, on April 11, Dr. Funk wrote a letter stating that Foster was "undergoing evaluation and will probably have surgery" and "should not return to his usual occupation until [his] medical issue is resolved." Appellant's App. vol. 1 at 231.

Meanwhile, according to the deposition testimony of Mountain Coal's senior managers, they had decided on April 9 to terminate Foster's employment. Although Langrand and Miller both testified that Mountain Coal terminated Foster's employment because Foster had lied about the return-to-work form he said he had left on White's desk, Jensen testified that Mountain Coal terminated his employment because Foster "did not present us with a correct Return-To-Work Form." Appellant's App. vol. 3 at 513. When asked to expand on his meaning, Jensen

11

testified that Foster "didn't have the right date for his release and stuff on it." *Id.* at 514.

Langrand testified that, on April 9, Miller called Foster to fire him, but Langrand conceded that Mountain Coal had no record of any such call. Miller testified that he tried to call Foster on either April 9 or April 10, but he also had no record of such a call. Although Foster did not specifically remember receiving a phone call from Miller on April 9 or April 10, Daniel Kunde, Foster's direct supervisor at West Elk, memorialized an April 11 telephone conversation he had with Foster in an e-mail dated April 12 in which Kunde noted that Foster said Miller had tried calling Foster on April 10 but that Foster had missed the call.

## G. Foster Notifies Mountain Coal About His Disability

The parties dispute what occurred on April 11. Foster testified that he went to Dr. Funk's office and picked up Dr. Funk's letter saying that Foster likely would need surgery and should not continue doing the same work. Foster first testified that at about 6:30 p.m. he called Kunde and read him Dr. Funk's letter. In an e-mail to Langrand and Miller the next day, Kunde mentioned this same timing and content of the call. But Foster later testified that he had picked up the letter at Dr. Funk's office at about 9:30 a.m. or 10:00 a.m. and called Kunde about thirty minutes later to read it to him. Foster relied solely on his memory as support for his calling Kunde at 9:30 a.m. or 10:00 a.m.

Mountain Coal agrees with Foster that, before the telephone call on April 11, Kunde knew nothing about Foster's suspension or termination. To support his

12

argument that Mountain Coal had not fired him by April 11, Foster testified that Kunde would have been "the first to know" about his termination because Kunde was his immediate supervisor and "[t]hat's just the way management works." Appellant's App. vol. 2 at 422.

Dr. Funk also testified about the events of April 11. Dr. Funk testified that he believed that his transcription service would have faxed the April 11 letter to his office before he signed it. The fax notation on the letter shows that Dr. Funk's office received the transcribed letter at 1:58 p.m., although nothing in the record establishes that the fax machine's time setting was accurate. Dr. Funk testified that the transcription service commonly faxed unsigned letters to him, which he would then sign and put into an outbox for mailing. If Dr. Funk's testimony is correct, Foster could not possibly have picked up the signed April 11 letter between 9:30 a.m. and 10:00 a.m. on April 11. We note that Dr. Funk testified regarding these facts and practices after reviewing the April 11 letter and various other case documents. Even with this review, however, he testified that he did not remember receiving the April 11 letter via fax from the transcription service, signing the letter, or seeing Foster pick up the letter from the office.

## H.    Mountain Coal Terminates Foster's Employment

On April 14, Foster received a mailed letter terminating his employment with Mountain Coal. The letter, dated April 11, terminated Foster's employment "effective April 9" because Foster "gave false information as to a credible Return To Work Slip." Appellant's App. vol. 1 at 230. We cannot know what date the letter was

13

actually mailed (whether on April 11 or afterward) since the postmarked envelope is not in the record. Nor has Mountain Coal offered any testimony about when the letter was signed and deposited in the mail.

## PROCEDURAL HISTORY

After Mountain Coal terminated his employment, Foster filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Colorado Civil Rights Division. Ultimately, the EEOC issued Foster a right-to-sue notice, and on December 26, 2012, Foster filed a complaint against Mountain Coal. Foster sought relief under the ADA and Colorado law. On the briefs, the district court entered summary judgment for Mountain Coal on Foster's ADA and state-law discrimination claims and on Foster's ADA retaliation claims. Foster appeals the dismissal of his ADA retaliation claims.

## DISCUSSION

Foster contends that the district court erred in granting Mountain Coal's motion for summary judgment on his ADA retaliation claims. We review de novo the district court's grant of summary judgment. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1205 (10th Cir. 2007). "In reviewing the record, we view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* "Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 (10th Cir. 2009). "A fact is material only if it might affect the outcome of the suit under the governing law. And

14

a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1265–66 (10th Cir. 2015) (citations and quotation marks omitted).

The ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Initially, we need to distinguish between the elements of an ADA retaliation claim and an ADA discrimination claim. To prosecute an ADA discrimination claim, a plaintiff must show that he is a "qualified individual with a disability." *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003) (quoting 42 U.S.C. § 12112(a)). But to prosecute an ADA retaliation claim, "a plaintiff need not show that []he suffers from an actual disability." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001). Rather, on this point, the plaintiff need only show that he had a reasonable, good-faith belief that he was disabled. *Id.*; *see Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA . . . ." (quoting 42 U.S.C. § 12203(a))).

Because Foster attempts to prove his retaliation claim using circumstantial evidence, "[t]he analytical framework pronounced in *McDonnell Douglas Corp. v.*

15

*Green*, [411 U.S. 792, 802–04 (1973)], guides our review." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999); *see Proctor*, 502 F.3d at 1207–08 ("When, as in the case before us, the plaintiff does not offer direct evidence of retaliation, we analyze a retaliation claim under the burden-shifting framework delineated in [*McDonnell Douglas*]."). Under this framework, once the plaintiff establishes a prima facie case of retaliation, "the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. If the employer can do so, the burden [of production] shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012) (citations and quotation marks omitted).

To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) he "engaged in a protected activity"; (2) he was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity"; and (3) there was "a causal connection between the protected activity and the adverse employment action." *Anderson*, 181 F.3d at 1178. Unquestionably, Foster was subjected to an adverse employment action—Mountain Coal terminated his employment. But Mountain Coal disputes that Foster engaged in a protected activity and that any purported protected activity was causally linked to his termination. In the district court, and now on appeal, Foster claims as protected activities his two requests for accommodation made on April 3 and April 11. We note that Foster may prevail on an ADA retaliation claim based on his April 3 protected activity, his April

16

protected activity, or a combination of both. This is why we refer to Foster's ADA retaliation "claims." But because Foster contends (and Mountain Coal does not dispute) that he experienced only one adverse employment action—termination of his employment—Foster technically maintains only one, broad ADA retaliation claim. But Mountain Coal argues that Foster cannot establish a prima facie case of ADA retaliation based on any combination of putative protected activity. Even if Foster somehow established a prima facie case of ADA retaliation, Mountain Coal argues that it still would be entitled to summary judgment because it has provided a legitimate, nondiscriminatory reason for Foster's termination and because Foster has not made the necessary showing of pretext.

After viewing the evidence in the light most favorable to Foster, we conclude that genuine issues of material fact exist regarding both Foster's April 3 and April 11 retaliation claims. Because the two claims involve separate issues of causation, we address each claim separately in our analysis.

## A. Foster's Prima Facie Case

### 1. Protected Activity

Before analyzing the protected-activity prong of Foster's prima facie case of ADA retaliation, we review what a plaintiff must show when alleging as "protected activity" the act of requesting an accommodation. First, a plaintiff must show an adequate request for an accommodation sufficient to qualify as protected activity. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194–95 (10th Cir. 2007) (discussing the adequacy of a request for accommodation in the causation context). Here, Foster

17

relies on his statements to Mountain Coal at the April 3 meeting and statements from Dr. Funk's April 11 letter that he read to his supervisor, Kunde. In response, Mountain Coal contends that Foster's requests were inadequate to notify it of Foster's "alleged protected activity." Appellee's Resp. Br. at 30. Second, the plaintiff must also show that he "had a reasonable, good faith belief that he was entitled to an accommodation" when he made the request.[5] *Jones*, 502 F.3d at 1194.

### a. *Adequate Requests for Accommodation*

Certain employee actions, such as filing an EEOC complaint, are indisputably protected activities under the ADA. *See Proctor*, 502 F.3d at 1208 ("Proctor clearly engaged in protected activity when he filed administrative charges with the [Office of Federal Contract Compliance Programs], EEOC, and the Kansas Human Rights Commission alleging disability discrimination based on UPS's failure to accommodate him and return him to work."). Similarly, this court and others recognize that a request for accommodation can constitute protected activity supporting a retaliation claim. *See Jones*, 502 F.3d at 1194 ("We have treated requests for reasonable accommodation as protected activity under the ADA."); *Selenke*, 248 F.3d at 1265 (concluding that evidence of requests for improvements to

---

[5] Mountain Coal doesn't argue that Foster lacked a reasonable, good-faith belief that he was entitled to an accommodation on either April 3 or April 11.

the work environment because of breathing difficulties could support a finding of protected activity).[6]

For an ADA retaliation claim, a request for accommodation is adequate if it is "sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004) (quotation marks omitted); *see EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (relying on *Calero-Cerezo*). "Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or her disability." *C.R. Eng.*, 644 F.3d at 1049 (quotation marks and emphasis omitted) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)); *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) ("An employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment due to a medical condition." (quotation marks omitted)).

---

[6] *See also Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) (noting that despite the text of the retaliation statute, "[t]he right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC"); *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) ("It would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation.").

Many courts have evaluated the adequacy of requests for accommodation in cases involving ADA discrimination claims. *See, e.g.*, *C.R. Eng.*, 644 F.3d at 1048–50; *Taylor*, 184 F.3d at 313–15. These cases also instruct us in evaluating the adequacy of requests for accommodation underlying retaliation claims, principally because an employee must engage in protected activity to prosecute a retaliation claim. And an inadequate request for an accommodation—one that does not trigger an employer's duty to provide a reasonable accommodation or participate in the "interactive process" of finding an appropriate accommodation—can never constitute protected activity. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) ("In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations . . . .").

### i. April 3 Request

We conclude that, viewing the evidence in the light most favorable to Foster, a reasonable jury could interpret Foster's comments at the April 3 meeting as an adequate request for accommodation—one direct and specific enough to put Mountain Coal on notice that he was requesting an accommodation for his neck injury. Therefore, summary judgment on this issue is inappropriate.

Foster argues that his April 3 request "adequately conveyed his desire for accommodation for his disability. Cooperation was requested in conjunction with his stated need to meet with his doctor to schedule surgery." Appellant's Opening Br. at 24. In response, Mountain Coal argues that "the district court correctly held that

20

[Foster's statements] were insufficiently 'direct and specific' to constitute a request for accommodation . . . [because they] could not have given Mountain Coal notice of Foster's alleged protected activity . . . ." Appellee's Resp. Br. at 30 (quoting Appellant's App. vol. 8 at 1817). We conclude that a reasonable jury could find Foster's statements sufficient to give Mountain Coal notice that he needed an accommodation for a disability.

Foster's deposition testimony recounting the April 3 meeting could be clearer. But at the summary-judgment stage—taking all inferences from the evidence in Foster's favor—his testimony is enough. A reasonable jury could conclude that, after being suspended, Foster asked for Mountain Coal's cooperation with an upcoming surgery and associated recovery. Mountain Coal argues that Foster's request failed to provide it notice that he was requesting an accommodation, but a reasonable jury could conclude otherwise given Mountain Coal's interest in obtaining Foster's return-to-work form for a known neck injury. Our circuit does not require Foster to use "the magic words 'reasonable accommodation.'" *C.R. Eng.*, 644 F.3d at 1049. Foster certainly didn't use those magic words here. But he said enough to survive summary judgment on the adequacy issue.

The cases Mountain Coal cites to support its argument that Foster's request for cooperation to deal with an upcoming surgery was inadequate are unpersuasive. Initially, Mountain Coal relies upon, and the district court found persuasive, *Freadman v. Metropolitan Property & Casualty Insurance Co.*, 484 F.3d 91 (1st Cir. 2007). In *Freadman*, an employee told her direct supervisor that she "needed to take

some time off because [she was] starting not to feel well." 484 F.3d at 103 (alteration in original) (emphasis omitted). The First Circuit concluded that this request lacked the necessary specificity because she failed to specify "*when* she would need that time off." *Id.* at 104 (emphasis in original). But Foster's comments are distinguishable from the *Freadman* employee's comments because—giving Foster the benefits of the evidence and inferences—Foster sought cooperation (an accommodation) to get his surgery and recovery "took care of." In this way, Foster's request was far more specific than asking for "time off" at some uncertain, future date. *See id.*

Also in support of its inadequate-request argument, Mountain Coal cites *EEOC v. Product Fabricators Inc.*, 763 F.3d 963 (8th Cir. 2014). In *Product Fabricators*, the Eighth Circuit concluded that an employee had inadequately requested an accommodation by simply telling his supervisor about his painful left shoulder "and that he was going to request surgery." *Id.* at 971. The employee also testified that he "may have spoken with [a different supervisor] about how much time he could take off for surgery." *Id.* Affirming the district court's grant of summary judgment for the employer, the Eighth Circuit concluded that the employee's testimony, "at best, demonstrates that [the employer] was aware of [the employee's] shoulder trouble, but it does not indicate that [the employee] actually requested time off for his surgery as an accommodation." *Id.* The Eighth Circuit also found it important that the employee had not met with his doctor to discuss surgery until eight days after his termination and was not formally assessed for surgery until a month after his termination. *Id.*

22

In contrast, Mountain Coal knew from Foster's comments on April 3 (several days before terminating his employment) that he was planning for a certain, imminent surgery, which he would schedule with his doctor the next day. We think Foster's request to attend his doctor appointment to schedule surgery (the implication being that the surgery had already been authorized) and the employee's request in *Product Fabricators* for time to meet with his doctor to ask about some type of shoulder surgery (the implication being that any surgery was far from certain) markedly differ.

Finally, Mountain Coal relies on an unpublished district-court opinion, *Schlect v. Lockheed Martin Corp.*, No. 11-cv-03072-RM-BNB, 2014 WL 4819006 (D. Colo. Sept. 29, 2014) (unpublished). In *Schlect*, an employee alleged that she had requested an accommodation by sending an e-mail to her employer, stating: "My concern is that I need further surgery." *Id.* at *3. The district court concluded that "a reference to a concern for a need for a future surgery is simply not the equivalent of having a disability and requesting an accommodation for that disability." *Id.* at *4. Here, Foster did not communicate a "concern for a need for a future surgery." *Id.* Rather, as mentioned, he communicated his need to have retraining rescheduled because he had a scheduled appointment, at which he said he *would* be scheduling surgery. As far as Mountain Coal then knew, Foster's appointment with Dr. Dwyer was a mere formality to schedule a surgery that Foster and Dr. Dwyer had already concluded was necessary. Simply put, giving Foster the benefit of the evidence and inferences from it, we conclude that Foster's comments at the April 3 meeting advised Mountain Coal

23

that he needed to take care of his surgery and to recover from it. In this regard, he asked for Mountain Coal's cooperation.

We conclude that a reasonable jury interpreting Foster's April 3 comments could find that Foster's comments "inform[ed] [Mountain Coal] of the need for an adjustment due to a medical condition." *Zivkovic*, 302 F.3d at 1089; *see Calero-Cerezo*, 355 F.3d at 23 (noting that to be adequate, requests for accommodation must be "sufficiently direct and specific, giving notice that [the employee] needs a special accommodation" (quotation marks omitted)). Summary judgment on this issue is therefore inappropriate.

### ii.      *April 11 Request*

Mountain Coal does not contest that Foster made an adequate request for accommodation on April 11 during his phone conversation with Kunde. This is understandable because Foster read to Kunde Dr. Funk's letter written that day, opining that Foster would likely need surgery and declaring Foster disabled from his current occupation.

### 2.    *Causation*

Because the parties agree that Foster experienced an adverse employment action, the final element Foster must show to support his prima facie case of ADA retaliation is that his engaging in protected activity was causally related to his termination. Our cases establish that the temporal proximity between Foster's protected activity (requests for accommodation) and his termination from employment suffice to establish this causal connection.

24

### a. Legal Standard

Foster and Mountain Coal disagree about whether evidence of temporal proximity between a protected activity and an adverse employment action, standing alone, is sufficient for a plaintiff to satisfy his burden of showing causation at the prima facie stage. Foster contends that the temporal proximity between his requests for accommodation and his later termination "is sufficient to establish causation." Appellant's Opening Br. at 35 (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239–40 (10th Cir. 2004)). Mountain Coal responds that under the Supreme Court's recent interpretation of Title VII's but-for causation requirement for retaliation claims, temporal proximity alone is insufficient to show causation in the ADA retaliation context. Appellee's Resp. Br. at 39–41 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)).

In this case, we need not determine the extent to which *Nassar* alters a plaintiff's burden to prove causation in his prima facie case of ADA retaliation. In *Ward v. Jewell*, 772 F.3d 1199 (10th Cir. 2014), we discussed *Nassar*'s impact on the *McDonnell Douglas* framework. *Ward*, 772 F.3d at 1203. Consistent with our precedent, we held that where a considerable length of time has elapsed between a protected activity and an adverse employment action, a plaintiff wishing to survive summary judgment must "present 'additional evidence' tying the adverse employment actions to [the plaintiff's protected activity]." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)); *see Anderson*, 181 F.3d at 1179 (noting that where three months elapsed between the protected activity and the

25

adverse employment action, "the plaintiff must rely on additional evidence beyond temporal proximity to establish causation"). Citing *Nassar*, we noted in *Ward* that "[t]he Supreme Court has likened this burden to a showing of 'but-for causation.'" *Ward*, 772 F.3d at 1203 (quoting *Nassar*, 133 S. Ct. at 2533).

*Ward* leaves intact our precedent holding that an ADA retaliation plaintiff may rely solely on temporal proximity to show causation during the prima facie stage of the *McDonnell Douglas* framework where his protected activity is closely followed by an adverse employment action. *See Anderson*, 181 F.3d at 1179 ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." (citations omitted)); *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) ("The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."). Therefore, *Nassar* has not altered the burden a plaintiff bears in supporting the causation element of a prima facie case of ADA retaliation. Because the purported protected activity here occurred mere days or even hours before the adverse employment action, we conclude that Foster can show causation at the prima facie stage solely with evidence of temporal proximity.[7]

---

[7] We acknowledge that some of our sister circuits disagree with our opinion in *Ward*, where we held that a retaliation plaintiff must show evidence of but-for causation at the prima facie stage of the *McDonnell Douglas* framework where substantial time has elapsed between the plaintiff's protected activity and the

### b. *April 3 Request*

The district court concluded that Foster did not raise a genuine issue of material fact about whether his April 3 request for accommodation caused his termination. Specifically, the district court concluded that Foster's April 3 request was not "direct and specific" enough to put Mountain Coal on notice of a needed accommodation "because Mr. Foster did not state that he had actually scheduled surgery or indicate how many days of leave he would need and when he would need to take them. As a result, Mr. Foster cannot show that Mountain Coal retaliated against him *as a result* of his comment." Appellant's App. vol. 8 at 1826 (emphasis added). We understand the district court to have concluded that causation was lacking because Foster's request for accommodation was inadequate. But we have concluded above that a reasonable jury could interpret Foster's April 3 comments as an adequate request for accommodation. Therefore, we likewise conclude that a reasonable jury could find that Foster's request for an accommodation (adequately conveyed and based on Foster's reasonable, good-faith belief that he was entitled to an accommodation) led to Mountain Coal's decision to terminate his employment, especially with the additional, strong evidence of temporal proximity between Foster's request and his termination.

Citing *Clark County School District v. Breeden*, 532 U.S. 268 (2001), Mountain Coal alternatively argues that even if temporal proximity is sufficient, it

---

resultant adverse employment action. *See, e.g.*, *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248–52 (4th Cir. 2015) (observing the circuit split and concluding that "*Nassar* does not alter the causation prong of a prima facie case of retaliation").

27

proceeded along previously contemplated lines of discipline when it terminated Foster's employment, thus disproving Foster's causation evidence. We disagree.

In *Breeden*, the Supreme Court considered whether an employee could maintain a Title VII retaliation claim when the employee had filed suit after obtaining an EEOC right-to-sue letter (protected activity) and had been transferred to another position shortly thereafter (adverse employment action). *Id.* at 272. The employee's sole evidence of causation was the temporal proximity between her protected activity and the adverse employment action. *Id.* The employee's supervisor, however, had mentioned contemplating the potential transfer before the supervisor ever learned of the employee's lawsuit. *Id.* at 271–72. The Supreme Court concluded that "[e]mployers need not suspend previously planned [adverse employment actions] upon [encountering an employee's protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* at 272.

Here, by contrast, Mountain Coal did not proceed under previously contemplated lines of discipline. It suspended Foster before he made his April 3 request and then fired him afterward. Mountain Coal's contemplated discipline varied. Thus, *Breeden* is inapposite. Moreover, *Breeden* may well prove inapposite for another reason, too. We see a genuine issue of material fact about why Mountain Coal suspended Foster. Mountain Coal says that it did so because Foster lied about having provided a return-to-work form. Disagreeing with this, Foster says that Mountain Coal suspended him for obtaining a return-to-work form from Dr. Funk,

28

who had never seen him for his neck injury. If a jury credits Foster's account of his suspension, that would mean that Mountain Coal suspended Foster for one reason (getting a form from the wrong doctor) and terminated his employment for another (lying about providing a return-to-work form). Then *Breeden* would not help Mountain Coal since Mountain Coal would obviously not have proceeded along previously contemplated lines of discipline—it would have suspended Foster for one reason and terminated him for a different reason.

Thus, we conclude that summary judgment is improper as to the causation prong of Foster's April 3 retaliation claim.

### c. April 11 Request

If Mountain Coal had terminated Foster by the time he made his April 11 request for accommodation during his telephone call with Kunde, Mountain Coal obviously would not have terminated him for the request. Indeed, Mountain Coal claims that it terminated Foster's employment on April 9. Because we conclude that, viewing the evidence in the light most favorable to Foster, a reasonable jury could find that Mountain Coal terminated Foster's employment after his April 11 request, we conclude summary judgment is inappropriate.

The district court held that Foster could not maintain an ADA retaliation claim against Mountain Coal based on his April 11 request for an accommodation because the court concluded that Foster had failed to raise a genuine issue of material fact about the accuracy of the Mountain Coal managers' testimony that they had terminated Foster on April 9. In reaching this conclusion, the district court did not

29

fully consider the evidence by which a jury could disbelieve the managers' account of an April 9 termination. For instance, everyone agrees that Foster's direct supervisor, Kunde, had not known about Foster's termination when Foster called Kunde on April 11.[8] A reasonable jury could infer from this fact that Foster had not been fired when he spoke with Kunde on April 11.

In addition, we agree with Foster that a reasonable factfinder could find that Mountain Coal's termination letter, which it dated April 11 and made retroactive[9] to April 9, was typed after Foster's telephone call to Kunde. In Foster's words, making the termination retroactive eliminated Mountain Coal's need to accommodate Foster for his April 11 request, and this "suspicious timing allows the inference that Mountain Coal learned of Foster's request and terminated him because of it." Appellant's Opening Br. at 31. Foster contends that there was "no other reason to

---

[8] Citing Fed. R. Civ. P. 56(c)(2), the court disregarded Foster's testimony that Kunde would be "the first to know" of Foster's termination because "[t]hat's just the way management works." See Appellant's App. vol. 8 at 1816 (quoting Appellant's App. vol. 2 at 422). The court concluded that Foster had failed to show he had personal knowledge of this management practice and had otherwise failed to lay the proper foundation for such testimony. We do not express an opinion as to the propriety of the district court's evidentiary ruling, noting instead that the information that is unquestionably within Foster's personal knowledge—that Kunde didn't seem to know about Foster's termination by April 11—is sufficient to give rise to an inference of causation.

[9] Mountain Coal takes issue with the use of the term "retroactive" in this context. It argues that the "April 11th letter did not make Foster's termination 'retroactive' to April 9th. Instead, it recited that Mountain Coal was terminating Foster '*effective* April 9.'" Appellee's Resp. Br. at 25–26 (emphasis in original) (quoting Appellant's App. vol. 1 at 230). We fail to see why this distinction matters, and we certainly don't conclude that Foster is "mischaracteriz[ing] the evidence," as Mountain Coal posits. *Id.* at 25.

make his termination retroactive," and that Mountain Coal "present[ed] no reason why it would keep Foster's termination secret for three days." *Id.* at 31–32. A jury could fairly agree.

A reasonable jury could find that Kunde's ignorance of Foster's termination, as well as the termination letter's carrying an effective date of April 9, which might relieve Mountain Coal of liability, could give rise to a reasonable inference that Mountain Coal knew of the April 11 request before drafting and sending the April 11 letter. Therefore, summary judgment on this issue is inappropriate.

## B.     Legitimate, Non-Discriminatory Basis for Foster's Termination

Having concluded that summary judgment is improper with regard to Foster's prima facie case of retaliation for both his April 3 and April 11 requests, the *McDonnell Douglas* framework shifts the burden of production to Mountain Coal to show that "it had a legitimate, nondiscriminatory reason for the adverse [employment] action." *Picture People*, 684 F.3d at 988.

Mountain Coal argues that it has carried its burden of production by showing that "Foster was terminated for lying about having provided an earlier Mountain Coal Return-To-Work form when, in fact, he had provided no such form." Appellee's Resp. Br. at 45. Foster does not contest that this testimony, if true, would suffice as a legitimate, non-discriminatory basis for termination. Instead, Foster disputes the truth of Mountain Coal's proffered reason for termination, arguing that it is mere pretext. Therefore, we continue to the third and final stage of our analysis.

## C. Pretext

The last step in the *McDonnell Douglas* framework shifts the burden of production back to Foster to show that Mountain Coal's stated justification for his termination was pretextual. *Picture People*, 684 F.3d at 988.

### 1. Legal Standard

"[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quotation marks omitted).

With regard to the pretext step of the *McDonnell Douglas* framework, we address both Foster's April 3 claim and April 11 claim together, concluding that a reasonable jury could disbelieve Mountain Coal's proffered reason for Foster's termination.

### 2. Analysis

We conclude that a reasonable jury could find that Mountain Coal's proffered reason for Foster's termination is unworthy of belief given Mountain Coal's inconsistent reasons for terminating Foster. Viewing the evidence in the light most favorable to Foster, we see a genuine issue of material fact about the reason for Foster's termination. Langrand and Miller testified that Mountain Coal terminated

Foster's employment because Foster lied about providing White the first return-to-work form. But Jensen testified that Mountain Coal terminated Foster's employment because Foster's return-to-work form "didn't have the right date for his release and stuff on it." Appellant's App. vol. 3 at 514. Mountain Coal argues on appeal that Jensen's contradictory testimony is insignificant and that "[a]lthough his testimony might have been clearer, he subsequently clarified the reason for Foster's termination" on both direct and cross examination. Appellee's Resp. Br. at 51. But a reasonable jury could hold Jensen to the reason he first gave for terminating Foster: an incorrect date on Foster's return-to-work form.

A reasonable jury could find this inconsistency, coupled with the termination letter's disputed effective date, sufficient to infer that Mountain Coal's proffered reason for terminating Foster's employment was pretext because it is so inconsistent and contradictory as to be unworthy of belief.[10] *Cisneros v. Wilson*, 226 F.3d 1113, 1134 (10th Cir. 2000) (concluding that "[a] rational trier of fact could infer pretext from the timing and manner of Defendants' action" and the "combination of

---

[10] We see one other matter a jury might choose to rely on as evidence of pretext. At oral argument, Mountain Coal's counsel was asked what additional information Mountain Coal learned between April 3 and April 9 (using Mountain Coal's alleged termination date) that led to Foster's termination. Counsel responded that after the managers suspended Foster at the April 3 meeting, they called Dr. Funk's office a second time. But nothing suggests that they learned anything beyond what they knew before the April 3 meeting. Although Foster did not argue this point on appeal or in the district court—arguing instead that Mountain Coal terminated his employment for a different reason than it suspended him—we note that a reasonable jury could infer pretext from this fact as well. *See Proctor*, 502 F.3d at 1205 ("In reviewing the record [on appeal], we view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.").

33

circumstances"), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), *as recognized in Murphy v. Samson Res. Co.*, 525 F. App'x 703, 707 (10th Cir. 2013) (unpublished). Summary judgment on pretext is therefore inappropriate.

## CONCLUSION

The district court erred in granting Mountain Coal's motion for summary judgment with respect to Foster's ADA retaliation claims. We conclude that a reasonable jury could find that Foster established a prima facie case of retaliation with respect to both his April 3 and April 11 purported requests for accommodation. We further conclude that a reasonable jury could find that Mountain Coal's asserted basis for terminating Foster's employment was pretext. We therefore reverse the district court's order granting Mountain Coal's motion for summary judgment with respect to Foster's ADA retaliation claims and remand for further proceedings.