FILED
United States Court of Appeals
Tenth Circuit

March 16, 2021

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

KELSEY FISHER,

     Plaintiff - Appellant,

v.

BASEHOR-LINWOOD UNIFIED
SCHOOL DISTRICT NO. 458,

     Defendant - Appellee.

No. 20-3115
(D.C. No. 2:18-CV-02664-DDC)
(D. Kan.)

_____

ORDER AND JUDGMENT[*]
_____

Before **PHILLIPS**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

Kelsey Fisher appeals the district court's order granting Basehor-Linwood

Unified School District No. 458's (District) motion for summary judgment on her

claims for disability discrimination and retaliation in violation of the Americans with

Disabilities Act (ADA). *See Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*,

460 F. Supp. 3d. 1167, 1207 (D. Kan. 2020). Exercising jurisdiction under 28 U.S.C.

§ 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

# I. BACKGROUND

Ms. Fisher was employed by the District as a certified teacher at Basehor-Linwood Middle School for school years 2015-16, 2016-17, and 2017-18. During the relevant time period, Amy Garver served as principal, Garold Baker served as assistant principal, and David Howard served as superintendent.

Ms. Fisher has Post-Traumatic Stress Disorder (PTSD), which "stems from a sexual assault she sustained." *Fisher*, 460 F. Supp. 3d at 1176. "Her symptoms include stress, anxiety, elevated heart rate, shortness of breath, panic attacks, nightmares, and insomnia." *Id.* "Dr. Kevin Mays, a psychiatrist, began treating her in November 2017." *Id.* According to Fisher, "[d]uring [her] first year teaching . . . she had shared with some co-workers—including Principal Garver—that she was a victim of a sexual assault. But . . . Garver didn't remember [Fisher] disclosing a disability diagnosis. Nor did [Fisher] seek accommodation for a disability." *Id.* (citation omitted).

According to Principal Garver, Ms. Fisher "struggled" with "classroom management," which is a "huge part of teaching." *Id.* at 1174, 1176 (internal quotation marks omitted). "[F]or the 2015-16 school year . . . [Garver noted that] students [in Fisher's classroom] were visiting with each other, working on homework for other classes, and goofing off." *Id.* at 1175 (internal quotation marks omitted). Also in 2015, Garver issued Fisher a disciplinary reprimand after she told "her class—out of frustration—'this is why I hate this class.'" *Id.* Fisher received "a second written reprimand in . . . 2016 after she said the word 'shit' in front of her

students." *Id.* And in 2017, Garver called Fisher's attention to an "incident . . . where she had explained the meaning of the word 'gangbanging' to students." *Id.* at 1175-76.

On or about November 16, 2017, Ms. Fisher "was in her classroom supervising 25 eighth grade students," when she had a panic attack. *Id.* at 1176. "[S]he stepped . . . into the hallway," where she was observed by another teacher who "went to the school office to seek help." *Id.* Principal Garver came to assist and "walked [Fisher] to the school nurse's office. The nurse checked [her] blood pressure and pulse. Both were elevated," *id.*, and she also had a racing heartbeat. The nurse told her to go to an urgent care facility.

"Principal Garver drove [Ms. Fisher] to the urgent care." *Id.* at 1177. But when Fisher "could not remember basic information like her birthdate," Garver helped "complete the [paperwork] for her." *Id.* Garver then accompanied Fisher to the examination room, and "sat in a chair in the corner of the room and read emails on her phone." *Id.* During the examination, Fisher told the nurse practitioner "that she was depressed and experiencing anxiety. She explained that the [recent] death of a high school classmate . . . had triggered her panic attack . . . [and] reminded her of an incident where she had been roofied and sexually assaulted when she was 21 years old." *Id.* (citations omitted). "The nurse . . . responded that her symptoms . . . sounded like . . . PTSD." *Id.* She prescribed anti-anxiety medication and told Fisher to "schedule a session with her counselor." *Id.* Garver later testified that she

remembered no details about the examination other than the "nurse practitioner prescribed medication . . . [and] permitted [Fisher] to drive herself home." *Id.*

Principal Garver drove Ms. Fisher back to the school and suggested that she "take a mental health day off work the next day." *Id.* at 1177-78 (internal quotation marks omitted). Later in the day, she "sent [Fisher] a text message asking if she had made it home." *Id.* at 1178. When Fisher expressed her concern over the day's events, Garver told Fisher to "call her counselor and take the next day off work for her mental health." *Id.*

"The next morning . . . [Ms. Fisher] met with Principal Garver[,] [and] shared that she was embarrassed about . . . Garver having been in the exam room." *Id.* "Garver responded that it was okay, . . . [and] suggested [the school's part-time psychologist,] Bo Youngblood[,] and [its social worker,] Kathryn Harter[,] as resources." *Id.* Fisher took the rest of the day off. "That evening, [Fisher] sent . . . Garver a text message asking for contact information for Dr. Youngblood and Ms. Harter." *Id.*

"On November 28, . . . Assistant Principal Baker met with [Ms. Fisher] about an incident where a student sustained a head injury in her classroom." *Id.* "According to [Fisher], [he] attributed the injury to her [poor] classroom management. After the meeting, [Fisher] left the . . . school for an appointment with her counselor." *Id.* (citation and internal quotation marks omitted). "Shortly before her appointment, [Fisher] sent a text message to Principal Garver, asking her again for Ms. Harter's contact information." *Id.* When "Garver responded a few minutes

later with Ms. Harter's phone number, [Fisher] replied by text message, saying 'she's the person who deals with suicide/depression, right?'" *Id.*

Minutes later, "Principal Garver responded that Ms. Harter was the social worker," and then followed up immediately by "asking if [Ms. Fisher] was concerned about a student." *Id.* Fisher said, "I guess I don't know what that entails but am trying to get connected with the right person." *Id.* (internal quotation marks omitted).

"Meanwhile, Principal Garver didn't understand [Ms. Fisher's] response to her text message, . . . [so] [t]wenty minutes [later,] she sent another text . . . [in which] she asked if [Fisher] was concerned for herself or a student. Garver continued to text [Fisher] but received no response." *Id.* She "also contacted Dr. Youngblood and Ms. Harter to see if they had heard from [Fisher]." *Id.* at 1179. "The three of them decided that, out of caution, . . . Garver should call for a welfare check on [Fisher]." *Id.* "Garver then called the suicide hotline and . . . [requested] a welfare check." *Id.* "Later that evening, Principal Garver called Assistant Principal Baker to inform him of what had happened . . . . She also called Superintendent Howard and told him about [Fisher's] panic attack." *Id.*

On November 30, Principal Garver and Assistant Principal Baker met with Ms. Fisher to "check on [her] well-being." *Id.* During the meeting, Garver asked Fisher about her "meeting with [her] psychiatrist." *Id.* at 1180. Fisher responded that "she didn't want to talk about her personal life." *Id.* "Garver [told Fisher] that when [her] personal life began to interfere with her job performance, they needed to talk about it." *Id.* Fisher said that "she understood . . . but objected to [being asked

5

questions] in front [of] . . . Baker." *Id.* Garver maintained that she was "concerned about what is happening in the classroom every day and whether students are safe and being taught their academics." *Id.* (internal quotation marks omitted). "During November and December 2017, [Garver] and . . . Baker never discussed [Fisher's] emotional and mental health," or "whether [the] sexual assault was affecting her emotional condition." *Id.*

In January 2018, "Principal Garver received a complaint from a parent about an incident . . . in [Ms. Fisher's] classroom in December 2017," *id.*, where "students [were] playing a game that involved saying the word penis," *id.* at 1181 (internal quotation marks omitted). "Garver [investigated and] concluded that [Fisher] had taken no action to truly stop the students' behavior, and somewhat participated in the behavior," when she "roasted a student by referencing the student's penis." *Id.* (internal quotation marks omitted).

"Principal Garver discussed the incident with Superintendent Howard, and they decided to suspend [Ms. Fisher], with pay, for two days." *Id.* Garver believed the suspension was appropriate "because of the severity of making fun or talking about a student's private part in front of an entire class." *Id.* (internal quotation marks omitted). Fisher "served her suspension on January 17 and 18." *Id.*

Ms. Fisher "returned from her . . . suspension on Friday, January 19." *Id.* "Sometime that day, a female student, L.A., used [Fisher's] computer to prepare a written statement asserting that other students had bullied her." *Id.* "[Fisher] deleted the statement [without ever] report[ing] L.A.'s concerns to her parents[,] . . . school

6

counselors[,] or administrators." *Id.* "[L]ater that day . . . S.P., [another] female student[,] asked to talk to [Fisher.]" *Id.* Fisher "invited S.P. to sit at a table in the back of the classroom and talk, although S.P. should have been completing the assigned classroom activity." *Id.* "L.A. . . . immediately joined their conversation." *Id.* S.P. began to complain about "her classmates, and females [in general]." *Id.* A.M., a female high school student who volunteered as a teacher's aide, came into the classroom and joined the discussion.

Sometime later, "an announcement over the intercom dismissed students from class to attend a pep assembly in the gymnasium." *Id.* at 1182. "Principal Garver expected the entire school to attend this assembly, and for teachers to sit with their students in designated areas." *Id.* S.P., L.A., and A.M., however, asked Ms. Fisher if they could stay in her classroom and skip the assembly and Fisher agreed, although she "never sought approval for the students to miss the assembly." *Id.* "During [the ensuing] conversation, [Fisher] permitted the students to read the letter of reprimand about her suspension and [also] discussed her discipline with the students." *Id.*

"Meanwhile, . . . Assistant Principal Baker took roll of the teachers," and "noted [Ms. Fisher's] absence . . . . Principal Garver also had noticed. After the assembly, she escorted [Fisher's] students back to her classroom" where she "saw [Fisher] and the three students sitting at the back table." *Id.* The students gathered their belongings and began leaving the classroom. But "[b]efore [S.P., L.A., and A.M.] left, [Fisher] told them not to let the administration back them into a corner when questioned about [skipping] the assembly." *Id.* (brackets and internal quotation

7

marks omitted). Fisher "knew she was in trouble for having met with the three students during the pep assembly." *Id.* (internal quotation marks omitted). When Garver asked S.P. and L.A. why they missed the pep rally, "[t]hey explained that they were talking to [Fisher] about friend problems." *Id.* (internal quotation marks omitted). Fisher later sent a text message to S.P. to find out what Garver asked her.

Ms. Fisher "took the following Monday . . . as a personal day." *Id.* She "spent time that day reviewing [the District's] policies on its website[,]" exchanging text messages with S.P., and then advising S.P. to delete their messages to prevent them from falling into the hands of school administrators. *Id.* at 1182-83. "Sometime that day, S.P. met with Principal Garver." *Id.* at 1183. Following the meeting, S.P. sent Fisher a text message telling her that "during the meeting, she had started to [fake] cry," a tactic that Fisher enthusiastically embraced. *Id.* (internal quotation marks omitted).

Principal Garver also met with L.A.'s mother, who reported the details of L.A.'s interaction with Ms. Fisher when she skipped the pep assembly and stayed behind in the classroom. "L.A. [told her mother] that [Fisher] had told her to tell . . . Garver that they had been talking about teen problems and friend issues, which L.A. did." *Id.* at 1184. But that was not true; instead, during the gathering, Fisher "told the students about her own personal issues and that she had been [sexually assaulted] and was attending counseling," and also that "Garver had called the police to [Fisher's] apartment because she believed she was suicidal." *Id.* L.A.'s mother also brought Garver's attention to several text messages between Fisher and L.A. where

8

they referred to each other as "mom" and "daughter," and Fisher told L.A. that she loved her. *Id.* (internal quotation marks omitted). L.A.'s mother believed the messages were inappropriate.

The next day, Ms. Fisher sent a text message to A.M. reminding her to stick to their story if contacted by school administrators, writing, "[w]e all have the same story. We talked about those student problems. You gave your input. That was it." *Id.* at 1185 (internal quotation marks omitted). She then "sent a second text message to A.M., saying 'I don't want them to know I talked to you so make sure you delete texts!!'" *Id.*

That same day, Ms. Fisher met with Principal Garver and Assistant Principal Baker about the pep assembly incident, who told her that she had been "negligent for not supervising her students." *Id.* (brackets and internal quotation marks omitted). Fisher acknowledged that she "was responsible for supervising students at the assembly, but that particular assembly was the first time that administrators had conveyed that it was important for teachers to attend." *Id.*

Superintendent Howard and Principal Garver also met and decided to suspend Ms. Fisher, with pay, until they could raise terminating her employment with the Board of Education (Board) at its next meeting. "According to . . . Howard, the pep assembly incident drove the termination decision," and Garver "never expressed concern . . . about [Fisher's] mental or emotional capacity to perform as a teacher." *Id.* Howard agreed with Garver's recommendation on the grounds that Fisher violated a policy that requires teachers to maintain professional relationships with

9

students and because her "absence from the pep assembly was inexcusable." *Id.* at 1186.

Principal Garver gave Ms. Fisher "a document outlining her neglect of her teacher responsibilities," including "carrying on conversations with middle school students about her personal life," which "exceeded the boundaries of a teacher/student relationship," and informed her that she would "not be retained as a teacher in the classroom." *Id.* (brackets and internal quotation marks omitted). "Later that day, Superintendent Howard notified [Fisher], in writing, of her suspension, pending the Board['s] next meeting." *Id.*

In the meantime, Ms. Fisher retained legal counsel and filed a complaint with the Equal Employment Opportunity Commission (EEOC). At the invitation of Fisher's counsel, the District agreed to mediate the dispute; however, when mediation failed, the District formally terminated her employment in April 2018.

Eventually, Ms. Fisher sued under the ADA for (1) an improper disability-related inquiry (42 U.S.C. § 12112(d)(4)(A)), (2) disability discrimination (42 U.S.C. § 12112(a), and (3) retaliation (42 U.S.C. § 12203(a)). The district court granted the District's motion for summary judgment. This appeal followed.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review the district court's grant of

10

summary judgment de novo, reviewing the evidence in the light most favorable to the nonmoving party." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218 (10th Cir. 2016) (brackets and internal quotation marks omitted).

### III. ANALYSIS

#### A. Disability-Related Inquiry

The ADA prohibits an employer from "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "A plaintiff asserting a claim under § 12112(d)(4)(A) must show (1) that [s]he is an employee of the defendant-employer, and (2) that the defendant-employer required h[er] to undergo a medical examination or made a disability-related inquiry of him." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 901 (10th Cir. 2017). But "[e]ven if the plaintiff makes the required showing, the employer may avoid liability by demonstrating that the medical examination or disability-related inquiry was job-related and consistent with business necessity." *Id.* "[C]ourts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Adair v. City of Muskogee*, 823 F.3d 1297, 1312 (10th Cir. 2016) (ellipsis and internal quotation marks omitted).

11

According to Ms. Fisher, the district court erred in finding that Principal Garver's question about her appointment with her psychiatrist was not a prohibited disability-related inquiry. But Fisher's argument misses the mark. The court did not resolve, one way or the other, whether the inquiry was disability-related; instead, it resolved the claim on the grounds that the inquiry was job-related and consistent with the business needs of the District.

"Even construing . . . Garver's question as a disability-related inquiry, a reasonable factfinder only could find that her inquiry was job-related and consistent with business necessity."

> As principal, . . . Garver was responsible for ensuring teachers could teach and supervise students effectively. In this context, her question about [Fisher's] psychiatrist appointment sought information about [Fisher's] ability to perform the essential functions of her job: teaching and supervising students . . . . [Fisher] had a panic attack in her classroom, rendering her unable to supervise her students. This incident alone gave . . . Garver a legitimate, nondiscriminatory reason to question [Fisher's] capacity to perform her job duties . . . . Given the undisputed facts that [Fisher] had suffered a panic attack in her classroom shortly before the inquiry, she had sent . . . Garver a text message referencing suicide and depression, and a student had sustained a head injury in [Fisher's] classroom while under her supervision, . . . Garver had compelling reasons to inquire about [Fisher's] ability to perform her job.

*Fisher*, 460 F. Supp. 3d at 1192.

Because Ms. Fisher failed to come forward with any evidence that Principal Garver's inquiry was not related to her job as a teacher and somehow inconsistent with the District's business needs, we affirm the district court's grant of summary judgment.

12

## B. Disability Discrimination

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). "ADA discrimination claims are generally subject to the *McDonnell Douglas* burden-shifting framework adapted from Title VII discrimination caselaw." *Kilcrease*, 828 F.3d at 1220.

At step one, "a plaintiff carries the burden of raising a genuine issue of material fact on each element of his prima facie case." *Id.* (internal quotation marks omitted). To establish a prima facie case, "a plaintiff must show (1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held . . .; and (3) that [s]he was discriminated against because of his disability." *Id.* at 1218-19 (internal quotation marks omitted). At step two, "[i]f plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* at 1220 (internal quotation marks omitted). And at step three, "[i]f defendant articulated a nondiscriminatory reason [for its actions], the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Id.* (internal quotation marks omitted).

For purposes of summary judgment, the district court assumed that Ms. Fisher carried her burden to establish a prima facie case, *see Fisher*, 460 F. Supp. 3d at

13

1193-96, and then found that the District "carried its burden to articulate legitimate, nondiscriminatory reasons for its adverse employment actions," *id.* at 1197.

To show pretext at step three, Ms. Fisher sought to compare her situation to four other teachers, without disabilities, who were not terminated for engaging in misconduct that she argued was more egregious than failing to attend a pep assembly and staying behind in the classroom to talk with a handful of students about her own mental-health problems, and then telling her students to lie about what they discussed. Specifically, she noted that the four non-disabled teachers received (1) a four-day suspension in 2015 for slapping a student, (2) a five-day suspension in 2016 for kicking a student in the foot, (3) a written reprimand in 2017 for bullying behavior toward students, and (4) a four-day suspension in 2018 for inappropriately touching a student's leg during track practice.

As further evidence of pretext, Ms. Fisher also cited Principal Garver's actions in November 2017, when she (1) directed her to take a mental health day following her panic attack, (2) assumed that she was talking about herself when she asked for information about suicide resources, (3) called for a welfare check, and (4) asked about her psychiatrist appointment. But the district court found that Fisher's evidence was insufficient "to [create] a triable issue whether [the District's] reasons for its adverse employment actions were pretextual." *Id.* at 1198. We agree.

"A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief."

14

*Williams*, 849 F.3d at 900 (internal quotation marks omitted). One way a plaintiff can show pretext is with evidence that she was "treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

"[S]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (internal quotation marks omitted). Moreover, in determining whether employees are similarly situated, a "court should also compare the relevant employment circumstances, such as work history . . ., applicable to the plaintiff and the intended comparable employees." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997); *see also Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004) (affirming summary judgment and holding that allegations of disparate discipline were insufficient to show pretext because court courts "afford substantial latitude to employers in making discipline related decisions," and there were "significant differences in conduct" among employees). "[A]t summary judgment, the court must determine whether plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Riggs*, 497 F.3d at 1117 (brackets and internal quotation marks omitted).

We agree with the district court that Ms. Fisher failed to demonstrate that she was similarly situated to the teachers who were either reprimanded or suspended—

15

but not terminated—for violating school policy. First, because Fisher provided no details of the teacher's bullying behavior that led to a reprimand, there was no evidence from which the court could conclude that Fisher and the teacher who bullied the students were similarly situated. Second, "[i]n the other three episodes of teacher misconduct—kicking a student's foot, slapping a student's face, and inappropriately touching a student—the disciplined teachers had one-time misconduct issues," and therefore, were "not similarly situated to [Fisher]," who had been "formally disciplined . . . twice . . . before [being] suspend[ed] [in January 2018]." *Fisher*, 460 F. Supp. 3d at 1201. We further agree that Principal Garver's actions did not create a triable issue whether the District's reasons for terminating Fisher's employment were pretextual because, as previously explained, her actions were job related and consistent with business necessity.

## C. Retaliation

Title 42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." When the plaintiff "attempts to prove his retaliation claim using circumstantial evidence, the analytical framework pronounced in *McDonnell Douglas* . . . guides our review." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016) (brackets and internal quotation marks omitted). "Under this framework, once the plaintiff establishes a prima facie case of retaliation, the

16

employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action." *Id.* (internal quotation marks omitted). To establish a prima facie case, "a plaintiff must prove that (1) he engaged in a protected activity; (2) he was subjected to or an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Id.* at 1186-87 (brackets and internal quotation marks omitted). "If the employer can do so, the burden of production shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *Id.* at 1186 (brackets and internal quotation marks omitted).

Ms. Fisher's theory for recovery is that the District terminated her employment in April 2018 as retaliation for filing a complaint with the EEOC. For purposes of summary judgment, the district court assumed that Fisher carried her burden to establish a prima facie case, *see Fisher*, 460 F. Supp. 3d at 1202-06, and that the District carried its burden to articulate legitimate, nondiscriminatory reasons for its adverse employment action, *id.* at 1206.

To show pretext at step three, Ms. Fisher "incorporate[d] by reference the pretext argument [and evidence] she made to support her discrimination claim," namely, that the District "had disciplined four similarly situated employees less harshly . . . for similar misconduct." *Id.* In other words, Fisher did not present any additional evidence of pretext in the context of a retaliation claim. We agree with the district court that "[f]or the same reasons [that this evidence did not support pretext

17

for discrimination], this evidence is insufficient to support a triable issue whether [the District] retaliated against [Fisher] for filing an EEOC [complaint]." *Id.*

## IV. CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

18